

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-12-1999

# USA v. Iannone

Precedential or Non-Precedential:

Docket 98-3373,98-3374

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Iannone" (1999). *1999 Decisions.* Paper 197.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/197

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 12, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-3373 and 98-3374

UNITED STATES OF AMERICA

v.

JOHN MICHAEL IANNONE,
Appellant

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Crim. Nos. 97-4 and 98-1)
District Judge: Honorable Robert J. Cindrich

Argued: December 10, 1998

Before: BECKER, Chief Judge, STAPLETON, Circuit Judge,
and HARRIS* District Judge.

(Filed: July 12, 1999)

        LINDA L. KELLY, ESQUIRE
        United States Attorney
        BONNIE R. SCHLUETER, ESQUIRE
         Assistant United States Attorney
        PAUL E. HULL, ESQUIRE (ARGUED)
         Assistant United States Attorney
        U.S. Attorney's Office
        633 U.S. Post Office and Courthouse
        Pittsburgh, PA 15219

        Counsel for Appellee
_____

* Honorable Stanley S. Harris, United States District Judge for the
District of Columbia, sitting by designation.

        STANLEY W. GREENFIELD,
         ESQUIRE (ARGUED)
        Greenfield, Brewer, Bailor & Kay
        Greenfield Court
        1035 Fifth Avenue
        Pittsburgh, PA 15219

        Counsel for Appellant

OPINION OF THE COURT

HARRIS, District Judge:

Defendant-appellant John Michael Iannone ("Iannone") appeals from the sentence imposed after his guilty plea to six counts of interstate transportation of property taken by fraud, one count of mail fraud, and one count of wire fraud. In determining Iannone's sentence pursuant to the United States Sentencing Guidelines ("U.S.S.G."), the district court applied several enhancements to the offense level. Iannone challenges two actual and one de facto enhancements: (1) a two-level increase pursuant to S 3A1.1 for a vulnerable victim; (2) a two-level increase pursuant to S 3B1.3 for abuse of a position of private trust; and (3) an upward departure, achieved via a two-level increase, pursuant to S 5K2.0 for conduct outside the "heartland" of the fraud guideline. We affirm the sentence.

I. FACTUAL BACKGROUND

Essentially, Iannone defrauded people by encouraging them to invest in oil and gas drilling ventures, but then using the investors' money for his personal expenses rather than for the promised purposes. Iannone committed these frauds against several victims, living in different states, over the course of several years. The total of the funds Iannone fraudulently obtained amounted to more than $600,000.

A. The Pennsylvania Frauds

In 1991 or 1992, Iannone started his own company, Horizon Natural Resources ("HNR"), after leaving his job as an executive at Consolidated Natural Gas. HNR was an oil

2

exploration and natural gas tract leasing company, with an office in Wexford, Pennsylvania. At least initially, HNR was a legitimate business.1 Iannone was HNR's sole owner and operator, giving himself the title of Chief Executive Officer ("CEO").

In early 1992, Iannone secured several leaseholds and two contractual farm-out arrangements with Exxon Corporation to drill and operate oil wells. Pursuant to the Exxon arrangement, Iannone contracted to drill a test well, Horizon No. 1, by a stated deadline. Despite two or three extensions of the deadline, Iannone never drilled the test well. By November 1992, Iannone's business appeared to be failing. He had not drilled any wells, all but one of his leaseholds had expired, and Exxon had terminated one of the two farm-out arrangements.2

In December 1992, Iannone began to solicit investment monies from his neighbors, ostensibly for the purpose of drilling and operating two wells, Horizon Nos. 1 and 2. Unaware of the precarious state of Iannone's business, his neighbors invested approximately $320,000 with him. Included among those investors were several members of one family, the Stringerts. Iannone had been a friend and neighbor of the Stringerts for several years. Iannone sold the Stringerts what he labeled "interests" or"shares" in Horizon Nos. 1 and 2 and entered into contracts with the Stringerts on behalf of HNR. However, rather than investing the money in the drilling project, Iannone used it for his own personal expenses.

Having spent all of that money by the end of October 1993, Iannone began to solicit further investments in the Horizon drilling project. Iannone told his victims various lies in order to encourage their investment. For example, he told one investor that the wells already were drilled and

---

1. The district court made a factual finding, at defendant's request, that HNR began as a legitimate business venture. ("I think then that what we need to do is make a finding . . . that this was not a fraud in the whole cloth[,] meaning that the entire venture from its inception was not created for the purpose of committing a fraud. That, originally, there was some legitimate business function . . . .").

2. Exxon terminated the remaining farm-out arrangement in April 1993.

3

producing and told others that the wells were going to be drilled in December 1993 and that he had acquired Exxon's overriding royalty interest in the wells. As a result of these solicitations, Iannone received another $170,000 in investment monies from neighbors and acquaintances in October, November, and December 1993. As with the prior investments, Iannone used this money for personal expenses.

From the time Iannone received the first investment monies in December 1992 until he absconded in January 1994, Iannone continually lied to the Stringerts and the other investors in order to conceal his conversion of their money to his personal use. He told some investors that he had used their money to hire a drilling company and that he was in contact with Exxon about a process that would increase their yield from the wells. When one investor -- Howard Stringert -- became suspicious, Iannone agreed to buy back his $100,000 investment in the oil well project once he received a settlement from a pending suit against Consolidated Natural Gas. However, those representations were false. Iannone had not hired a drilling company, was not in contact with Exxon about a process to increase the wells' yield, and had already settled the litigation with Consolidated Natural Gas over a year-and-a-half earlier for only $17,000. Iannone did not use any of the investment monies for the drilling project; he took it all for his personal use.

Throughout the period in which Iannone was soliciting his neighbors to invest in the Horizon project, he was falsely posing as a decorated Vietnam veteran. This adopted military hero persona helped Iannone gain the trust of the Stringert family. He provided some members of the Stringert family with a resume falsely indicating that he had spent three years in Vietnam as a Captain in the U.S. Army Special Forces and that he had been awarded several medals, including the Purple Heart and the Silver Star, and he represented that he had received a recommendation for the Congressional Medal of Honor. He provided the Stringerts with a false citation recounting the heroic acts for which he supposedly received the Silver Star. Howard Stringert described the story recounted in the citation as

4

"Ramboesque."3 One member of the family, Janice Stringert-Streich, visited Iannone's home where he had a Silver Star medal prominently displayed. Janice and her brother Howard Stringert both testified at the sentencing hearing that their family had great respect for military veterans and that this influenced their decisions to invest with Iannone.

By October 1993, some investors had become suspicious of Iannone, and he prepared for his disappearance, buying a truck under a false name with some of the investment money. On January 11, 1994, Iannone disappeared, leaving his wife and three children behind. Approximately $70,000 to $110,000 in investment funds were unaccounted for at the time of his abscondance. In order to avoid being pursued, Iannone faked his own death. He left behind a letter claiming that he had left on a secret mission for a government "alphabet agency" and that he feared it might result in his death. He then left his van, splattered with blood and littered with shell casings from a weapon, parked at the Greater Pittsburgh International Airport. Local police quickly realized both that the scene had been fabricated and that Iannone had not been the victim of a crime.

B. The Colorado Frauds

After his disappearance from Pennsylvania, Iannone settled in Colorado where he adopted the alias Wayne D. Hamilton, the name of a deceased Vietnam veteran. He continued to masquerade as a Vietnam war hero and told acquaintances that his family had been killed by a drunk driver. Posing as a Vietnam veteran, he befriended several people, including Clancy O'Dowd and Diana Hegler, through an America Online chat room for veterans. He developed a close friendship with O'Dowd, based on their supposed shared combat experiences in Vietnam.

Apparently, Iannone lived off the Pennsylvania fraud proceeds for about three years. When he ran low on money, Iannone essentially repeated his Pennsylvania scheme. As

_____

3. The citation recounts a bold, dramatic tale in which Iannone, as the commanding officer of a Special Forces A-Team, rescued four American prisoners of war held captive deep within enemy territory.

5

head of W. D. H. Associates, a sham oil and gas company, Iannone offered his new friends and neighbors the opportunity to invest in oil and/or gas wells in Texas and Nebraska. Several of his friends and neighbors acquiesced, buying percentage shares of oil and/or gas well leases from Iannone. As with the Pennsylvania frauds, Iannone did not invest this money for the purpose that it was entrusted to him, but used it for personal expenses. He received approximately $115,500 from the Colorado frauds.

Again, Iannone lied to the investors in order to conceal his fraud. Iannone told investors that the wells were producing and that they should expect their first royalty checks to arrive in March or April of 1997. When the checks did not materialize, Iannone again disappeared. On or around June 3, 1997, Iannone left Colorado, falsely informing most investors that he was going to Texas to check on the wells. He told one investor, O'Dowd, a different lie: that he was going to confront the drunk driver who had killed his family. When some of the investors began to communicate with each other and became suspicious, Iannone sent them an electronic message claiming to be an employee of an "alphabet agency" in the witness protection program. Iannone was arrested by the Federal Bureau of Investigation in July 1997.

C. The District Court's Sentence

Iannone pled guilty to six counts of interstate transportation of property taken by fraud, one count of mail fraud, and one count of wire fraud. The district court conducted a two-day sentencing hearing at which four of Iannone's victims testified: O'Dowd, Hegler, Janice Stringert-Streich, and Howard Stringert. The court found several Guidelines enhancements to be applicable. Based on O'Dowd's testimony, the court determined that he was a vulnerable victim and increased Iannone's offense level by two points pursuant to S 3A1.1 of the Guidelines. The court also determined that Iannone occupied a position of private trust vis-a-vis his victims and abused this trust, and therefore increased the offense level by two points pursuant to S 3B1.3 of the Guidelines. The court increased Iannone's offense level by an additional two points consistent with S 5K2.0 of the Guidelines, finding that, based on a

6

combination of factors, Iannone's conduct was sufficiently outside the "heartland" of the fraud guideline to warrant an upward departure. Based on a total guidelines offense level of 21 and a criminal history category of I, which provided a range of imprisonment of 37 to 46 months, the court sentenced Iannone to 46 months of imprisonment. See United States Sentencing Commission, Guidelines Manual, Ch. 5, Pt. A (Nov. 1997).4

II. DISCUSSION

Iannone argues that the increases in his offense level were improper and that he should have been sentenced based on a offense level of 15, which established a range of 18 to 24 months of imprisonment. See U.S.S.G. Ch.5, Pt. A (Nov. 1997).

A. Vulnerable Victim Adjustment

Iannone challenges the district court's decision to apply a two-level "vulnerable victim" offense level adjustment pursuant to S 3A1.1(b), claiming that the victim on which the court based its decision -- O'Dowd -- was not a vulnerable victim within the meaning of the provision. He also argues that, even if O'Dowd was a vulnerable victim, there was no demonstrated nexus between his vulnerability and the fraud. A district court's factual findings concerning the vulnerable victim adjustment are reversible only for clear error. See United States v. Monostra, 125 F.3d 183, 188 (3d Cir. 1997) (citing United States v. Hillstrom, 988 F.2d 448, 450 (3d Cir. 1993)). Because we find the district court did not clearly err in determining that O'Dowd was a vulnerable victim and that Iannone exploited this vulnerability to aid in his commission of the fraud, we affirm the district court's two-level enhancement under S 3A1.1(b).

_____

4. We apply the November 1997 edition of the Guidelines Manual, as that was the version in effect on the date of Iannone's sentencing -- June 19, 1998. See U.S.S.G. S 1B1.11(a) (Nov. 1997) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."); 18 U.S.C. S 3553(a)(4).

7

Section 3A1.1(b) provides that:

> If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

U.S.S.G. S 3A1.1(b) (Nov. 1997).5 Application Note 2 to subsection (b) provides a useful example of when this enhancement is appropriately applied:

> The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

U.S.S.G. S 3A1.1, comment. (n.2) (Nov. 1997). Thus, the note suggests that this enhancement is designed to apply where a defendant knowingly or recklessly exploits a victim's vulnerability in order to facilitate his commission of the crime.

In accordance with S 3A1.1 and its corresponding application note, this Court applies a three-step analysis to a decision to apply the vulnerable victim enhancement. The enhancement may be applied where: (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was "a nexus between the victim's

_____

5. While it does not affect our analysis, we note that S 3A1.1(b) recently has been amended. The new provision states that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. S 3A1.1(b)(1) (Nov. 1998). The amended provision also adds a subsection increasing the offense level by an additional two levels if the offense "involved a large number of vulnerable victims." U.S.S.G. S 3A1.1(b)(2) (Nov. 1998).

8

vulnerability and the crime's ultimate success." Monostra, 125 F.3d at 190 (quoting United States v. Lee , 973 F.2d 832, 834 (10th Cir. 1992) (internal quotation marks omitted)).

1. O'Dowd Was Particularly Vulnerable to Iannone's
        Criminal Conduct

Iannone argues that the district court improperly found O'Dowd was a vulnerable victim based merely on his status as a Vietnam veteran. This argument is without merit, as it is abundantly clear from the record that the court did not base its finding of O'Dowd's vulnerability merely on broad, unsupported generalizations relating to his veteran status. O'Dowd testified at length at the sentencing hearing, and, based on his testimony, the court made express, specific findings as to his particular susceptibility as well as Iannone's knowledge of this susceptibility. In rendering its sentencing decision as to the S 3A1.1 enhancement, the court noted:

> [The question is whether] O'Dowd [was] particularly vulnerable in some way different from the general public, and I have no problem in saying[ ] yes. Just because he's a big strong man and a veteran of combat doesn't mean that he [was not] vulnerable in a very, very tragic way[,] and that is just as he described it so beautifully in his testimony. He developed a belief that people who share combat are brothers-in-arms and can be believed. He made that [belief] known to the defendant. So, [I find that] he was vulnerable in that he was more susceptible to be deluded [and] cheated by someone who represented himself to be a brother-in-arms. . . . O'Dowd was vulnerable in the way he described he was vulnerable, and it was a particular vulnerability because it wouldn't apply to the general public but only to someone who expressed himself as he did.

Thus, contrary to Iannone's assertions, the district court did not find that Vietnam veterans are per se vulnerable to persons claiming to be fellow veterans and then rely solely on O'Dowd's veteran status to find that he was a vulnerable victim. Rather, the court based its determination that

9

O'Dowd was a vulnerable victim on his individual personality traits and characteristics, as testified to by O'Dowd at the sentencing hearing. Only after this specific inquiry did the court find that O'Dowd was particularly vulnerable to one representing himself as a fellow combat veteran. Thus, the district court did not clearly err in determining that O'Dowd was "particularly susceptible" to Iannone's fraud.

2. Iannone Knew or Should Have Known of O'Dowd's Vulnerability

The district court specifically found that Iannone knew or had reason to know of O'Dowd's vulnerability to fellow Vietnam veterans. ("I find by a preponderance of the evidence that the defendant knew or had reason to know that . . . O'Dowd[ ] [was] vulnerable to a predation by somebody who purported to be a colleague at war[ ] [and] a brother-at-arms."). The record provides ample evidence to support this finding. O'Dowd's testimony, supported by correspondence between O'Dowd and Iannone introduced into evidence at the sentencing hearing, demonstrates that Iannone actively encouraged and developed a friendship with O'Dowd, based in large part on their supposed shared combat experiences in Vietnam. The friendship between the two men began through an America Online chat room for military veterans and progressed to telephone calls, electronic messages, and meeting in person on approximately three occasions. During the course of their friendship, Iannone and O'Dowd discussed their feelings about honor, duty, and the bonds between fellow combat veterans on several occasions. In many of their communications, Iannone and O'Dowd used the phrase "back to back," which, according to O'Dowd's testimony, is a phrase derived from his Vietnam experience that essentially means "I would put my life in your hands and trust you to use it properly." Similarly, O'Dowd and Iannone often referred to one another as "brother" in their correspondence. O'Dowd testified that Iannone was aware of his feelings of trust and loyalty towards fellow combat veterans generally and towards Iannone in particular. Thus, the record provides sufficient evidence that Iannone was aware of O'Dowd's vulnerability.

10

### 3. O'Dowd's Vulnerability Facilitated Iannone's Crime

The district court also found that O'Dowd's vulnerability facilitated Iannone's fraud, noting the link between 839<!>O'Dowd's vulnerability, Iannone's awareness of that

vulnerability, and Iannone's fraud. ("It [is] clear that [O'Dowd's] vulnerability was made known to the defendant. That's why it was so easy for the defendant to extract these funds from [O'Dowd] . . . without much in the way of proof of what he was going to get for it."). Iannone disputes this finding, arguing that, even if O'Dowd was a vulnerable victim, there was no demonstrated nexus between this vulnerability and Iannone's crime. However, the record supports the court's finding. According to O'Dowd's testimony, Iannone framed his investment offer as a plea for help. Iannone initially asked O'Dowd for a loan, claiming that an investor had backed out of one of his investments and that he was going to lose the entire investment. Only later did Iannone suggest that O'Dowd invest in the project himself, rather than lend him money. O'Dowd testified that he invested primarily because he was concerned that his "brother" was in trouble and he would do anything he could to assist him. He also testified that he made this known to Iannone. Thus, based on the evidence before it, the district court did not err -- much less "clearly"-- in determining that O'Dowd's vulnerability facilitated Iannone's fraud.

In sum, we find that the district court did not clearly err in finding: (1) that O'Dowd was particularly vulnerable to Iannone's fraud; (2) that Iannone was, or should have been, aware of his vulnerability; and (3) that O'Dowd's vulnerability facilitated Iannone's crime. We therefore affirm the decision to enhance the offense level underS 3A1.1(b).

### B. Abuse of a Position of Trust Enhancement

Iannone claims that the district court erred in applying a two-level enhancement to his offense level pursuant to S 3B1.3 of the Guidelines for his abuse of a position of private trust. Section 3B1.3 provides in part that:"If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. S 3B1.3 (Nov. 1997). In applying S 3B1.3, a court must

11

initially determine whether the defendant occupied a position of public or private trust. If he did occupy such a position, then the court must determine whether the defendant abused this position of trust in a way that significantly facilitated his crime. See United States v. Craddock, 993 F.2d 338, 340 (3d Cir. 1993). Because Iannone challenges only the initial determination of whether he held a position of trust, we devote most of our discussion to this issue. We review de novo a district court's determination that a defendant occupied a position of trust within the meaning of S 3B1.3, as this is a legal question. See United States v. Sokolow, 91 F.3d 396, 412 (3d Cir. 1996) (citing Craddock, 993 F.2d at 340). We review a district court's finding that a defendant abused a position of trust for clear error, as this is a factual question. Id.

Iannone argues that he did not occupy a position of trust with respect to his victims, and therefore the district court should not have enhanced his offense level pursuant to S 3B1.3. Determining what constitutes a position of trust for the purposes of S 3B1.3 is not a simple task. Neither S 3B1.3 nor its applicable Commentary clearly defines what is meant by a "position of trust." United States v. Smaw, 993 F.2d 902, 905 (D.C. Cir. 1993). "Position of trust" could be defined narrowly to encompass only formal fiduciary or employment relationships. Or, the concept could be defined broadly to include any relationship in which a victim places his trust in the defendant. The Commentary to S 3B1.3 indicates that the Sentencing Commission ("Commission") did not intend for the term "position of trust" to be interpreted too narrowly, as the Commentary does not limit the phrase's application only to formal fiduciary or employment relationships. See U.S.S.G. S 3B1.3, comment. (n.1) (Nov. 1997). However, a court should hesitate before defining the concept too broadly, as "there is a component of misplaced trust inherent in the concept of fraud." United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998) (quoting United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995) (internal quotation marks omitted)); see also United States v. Trammell, 133 F.3d 1343, 1355 (10th Cir. 1998) ("The [S 3B1.3] guideline enhancement requires more than a mere showing that the victim had confidence in defendant.") (citing United States v. Brunson, 54 F.3d 673,

12

678 (10th Cir. 1995)); United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) ("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud.").

Application Note 1 of the Commentary to S 3B1.3 provides some guidance as to what is considered a position of public or private trust for the purposes of this guideline provision. It states in part:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

U.S.S.G. S 3B1.3, comment. (n.1) (Nov. 1997). The application note also provides specific examples explaining when S 3B1.3 should or should not be applied:

> This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk . . . .

Id.

In accordance with the Commission's guidance, this Court has developed a "position of trust" analysis that "look[s] to the essence of the meaning of a position of trust." United States v. Pardo, 25 F.3d 1187, 1191 (3d Cir. 1994); see also United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993) (stating that, in determining whether a defendant occupies a "position of trust," a court "must look beyond descriptive labels to the actual nature of the relationship and the responsibility the defendant is given"). We consider three factors in determining whether a

13

defendant occupies a position of trust for the purposes of
S 3B1.3: "(1) whether the position allows the defendant to
commit a difficult-to-detect wrong; (2) the degree of
authority which the position vests in the defendant vis-a-vis
the object of the wrongful act; and (3) whether there has
been reliance on the integrity of the person occupying the
position." Pardo, 25 F.3d at 1192. These matters "should be
considered in light of the guiding rationale of[S 3B1.3]--to
punish `insiders' who abuse their positions rather than
those who take advantage of an available opportunity." Id.
This Court has expressly refused to "draw a bright line
limiting the abuse of trust increase to the employment
relationship." Id. at 1190-1191. A defendant may occupy a
position of trust outside the traditional employment
context. Id.

Based on our consideration of S 3B1.3 and the case law
interpreting the provision, we agree with the district court's
conclusion that Iannone occupied a position of private trust
vis-a-vis his Pennsylvania victims.6 The facts of this case

_____

6. Because we find that Iannone occupied a position of trust vis-a-vis his
Pennsylvania victims, it is not necessary to decide whether he also
occupied a position of trust vis-a-vis his Colorado victims. Iannone's
conduct with respect to the Pennsylvania frauds, by itself, justifies
application of the S 3B1.3 enhancement. The record does not provide as
much information about Iannone's Colorado frauds. Apparently, his
Colorado frauds were committed in a very similar fashion as his
Pennsylania frauds, with one significant difference. In connection with
the Colorado frauds, Iannone solicited investments in drilling projects in
his capacity as head of W.D.H. Associates ("WDH"), a sham oil and gas
company. Unlike HNR, which was a legitimate company at one time,
WDH was apparently a sham company from the start. Thus, Iannone
never occupied any legitimate position of trust with respect to his
Colorado victims.

Although the issue is not of dispositive significance, we note that the
majority of circuits that have addressed it have held that a defendant
occupying a sham position of trust is subject to theS 3B1.3
enhancement. See United States v. Deal, 147 F.3d 562, 563 (7th Cir.
1998); United States v. Barnes, 125 F.3d 1287, 1292 (9th Cir. 1997);
United States v. Gill, 99 F.3d 484, 488-89 (1st Cir. 1996); United States
v. Queen, 4 F.3d 925, 929 (10th Cir. 1993). But see United States v.
Echevarria, 33 F.3d 175, 181 (2d Cir. 1994). According to the majority

14

show that all three Pardo factors have been met: Iannone's
position as head of the company in which the victims
invested made his fraud difficult to detect, vested him with
significant authority over the victim's investment monies,
and encouraged his victims to rely on his perceived
integrity.

_____

view, where a defendant provided his victims with sufficient, objective
indicia that he occupied a position of trust, it is appropriate to hold
him
accountable under S 3B1.3. From the perspective of the victim, the
threat posed is the same whether the defendant occupies a legitimate or
sham position of trust: the position facilitates the crime and reduces the
chance of detection. See Gill, 99 F.3d at 489.

We also note that the Commentary to S 3B1.3 recently has been
amended to clarify that defendants holding sham positions of trust are
within the purview of the enhancement:

        This adjustment also applies in a case in which the defendant
        provides sufficient indicia to the victim that the defendant
        legitimately holds a position of private or public trust when, in
fact,
        the defendant does not. For example, the adjustment applies in the
        case of a defendant who (A) perpetrates a financial fraud by
leading
        an investor to believe the defendant is a legitimate investment
        broker; or (B) perpetrates a fraud by representing falsely to a
patient
        or employer that the defendant is a licensed physician. In making
        the misrepresentation, the defendant assumes a position of trust,
        relative to the victim, that provides the defendant with the same
        opportunity to commit a difficult-to-detect crime that the
defendant
        would have had if the position were held legitimately.

U.S.S.G. S 3B1.3, comment. (n.2) (Nov. 1998). With limited exception,
Guidelines commentary is binding on courts. See Stinson v. United
States, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual
that interprets or explains a guideline is authoritative unless it
violates
the Constitution or a federal statute, or is inconsistent with, or a
plainly
erroneous reading of, that guideline."); see also U.S.S.G. S 1B1.7 (Nov.
1997) ("Failure to follow . . . commentary could constitute an incorrect
application of the guidelines . . . .") (citing 18 U.S.C. S 3742). An
amendment to Guidelines commentary that merely "clarifies" the
meaning of a guideline is given great weight, unless its application would
be unconstitutional. See United States v. Menon, 24 F.3d 550, 567 (3d
Cir. 1994); cf. U.S.S.G. S 1B1.11(b)(2) ("[I]f a court applies an earlier
edition of the Guidelines Manual, the court shall consider subsequent

amendments, to the extent that such amendments are clarifying rather than substantive changes.").

15

First, Iannone's position allowed him to commit a difficult-to-detect wrong. Iannone primarily argues that his fraud was easily detectable, but was not discovered due to his victims' lack of diligence. Iannone's argument evinces a misunderstanding of the first Pardo consideration. That prong of the Pardo analysis is not a due diligence requirement. Iannone's victims did not have to be experts in the oil and gas industry or conduct an extensive investigation into Iannone's business for the S 3B1.3 enhancement to be applicable. In fact, one rationale for a S 3B1.3 enhancement is that, where the defendant occupies a position of trust, his victims are less likely to discover his fraud because they will not investigate the matter as thoroughly as they would in an arm's-length transaction. The focus of the first Pardo prong is on the defendant, not his victims, and requires the court to determine whether the position the defendant occupied allowed him to commit a difficult-to-detect crime.

In connection with his Pennsylvania frauds, Iannone solicited investors in his capacity as the owner and CEO of HNR, an oil and gas drilling/leasing company. Iannone solicited investment monies for the express purpose of financing an exploratory drilling venture, selling the victims "interests" or "shares" of HNR's Horizon projects and signing contracts with the victims on behalf of the company. Thus, Iannone occupied a "managerial" position, in which he expectedly was entrusted with the task of using the investors' money to complete a drilling project. By contrast, his victims were merely passive investors with little, if any, knowledge of the oil and gas industry. These facts indicate that Iannone's relationship with his Pennsylvania victims was analogous to the fiduciary relationship that exists between a corporate officer or director and the corporation's shareholders.

This fiduciary-like relationship allowed Iannone to commit a difficult-to-detect wrong. His managerial position allowed him to conceal his personal use of the victims' investment money. In order to prevent his fraud from being detected, he provided the victims with false reports on the progress of the drilling project and his use of their investment money. Because Iannone was the sole owner

16

and operator of HNR, he was the victims' only source of information about the status of their investment and was not subject to any supervision that would have uncovered his fraud.

Iannone's position also satisfies the second Pardo criterion, as it provided him unfettered authority over the victims' investment money. As sole owner and operator of HNR, he alone was entrusted with the proper use of the investment money to complete the drilling project. This total lack of supervision allowed Iannone to spend the investment money freely. Once his victims invested in HNR, no one but Iannone had access to, or supervisory power over, HNR's financial records and bank accounts.

Finally, the evidence demonstrates the victims' reliance on Iannone's perceived integrity as owner and CEO of HNR. Iannone gave some of his victims his resume listing years of experience in the oil and gas industry and providing detailed descriptions of that experience. Iannone further fostered reliance on his integrity by posing as a decorated Vietnam veteran. Some of his victims indicated that they decided to invest with Iannone because he was both a veteran and an experienced businessperson offering what seemed to be a great investment opportunity. Based on Iannone's representations, his victims believed they were investing in a genuine drilling project.

Thus, application of the three Pardo considerations to Iannone's case demonstrates that, as CEO of HNR, he occupied a position of private trust vis-a-vis his Pennsylvania victims.7 The foregoing analysis accords with our decisions in recent cases involving similar factual situations. See United States v. Bennett, 161 F.3d 171, 195–96 (3d Cir. 1998); Sokolow, 91 F.3d at 412–13. Having found that Iannone occupied a position of private trust, we also conclude (and appellant does not challenge) that the

_____

7. Iannone also argues that the S 3B1.3 enhancement is inapplicable because his friendship with the victims did not constitute a position of trust. This argument ignores a critical fact of this case: Iannone solicited
investments from his friends and neighbors in his capacity as head of a company. The position of trust at issue is not Iannone's friendship with the victims, but his position as owner and CEO of HNR.

17

district court did not clearly err in finding Iannone abused his position of trust in a manner that significantly facilitated his crime. Therefore, we affirm the district court's decision to enhance Iannone's offense level pursuant to S 3B1.3.

C. Section 5K2.0 Departure

Finally, Iannone challenges the district court's decision to impose an upward departure (set at two levels) pursuant to S 5K2.0, based on a combination of factors that took the case out of the "heartland" of the fraud guideline. A district court's decision to depart from the applicable guideline range is subject to review for abuse of discretion. See Koon v. United States, 518 U.S. 81, 99–100 (1996); United States v. Jacobs, 167 F.3d 792, 798 (3d Cir. 1999). Wefind the district court did not abuse its discretion by departing from the Guidelines in this case.

The Commission conceives of each offense guideline as "carving out a `heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., Ch.1, Pt. A, intro. p.s. 4(b) (Nov. 1997). In the unusual case in which a defendant's conduct falls outside the typical "heartland," the court may consider a departure from the Guidelines sentence. See id.; United States v. Baird, 109 F.3d 856, 870 (3d Cir.), cert. denied, 118 S.Ct. 243 (1997) (citing Koon, 518 U.S. at 93–94). Section 5K2.0 provides that a court may impose a sentence outside the applicable guideline range "if the court finds `that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. S 5K2.0, p.s. (Nov. 1997) (quoting 18 U.S.C. S 3553(b)). The Commentary to S 5K2.0 adds that a court may also depart in the "extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the `heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case," but also notes that these departures "will be extremely rare." Id., comment.; see also Koon, 518 U.S. at

18

113-114 (noting that departure is possible based on a combination of factors, even though none of the factors standing alone would justify a departure). Outside of a limited number of prohibited factors that a court may never consider as grounds for departure, the Guidelines do not "limit the kinds of factors . . . that could constitute grounds for departure in an unusual case."8 U.S.S.G., Ch.1, Pt. A, intro. p.s. 4(b) (Nov. 1997); see also Koon, 518 U.S. at 106; Baird, 109 F.3d at 870.

The Supreme Court provided additional guidance on departures in Koon, instructing courts to apply the following analysis when considering a S 5K2.0 departure. First, identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual. Koon, 518 U.S. at 95. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all.9 Id. at 94-95. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the

_____

8. The prohibited factors that a court may never consider are listed in SS 5H1.10 (race, sex, national origin, creed, religion, socio-economic status), 5H1.12 (lack of guidance as a youth and similar circumstances), part of 5H1.4 (drug or alcohol dependence or abuse), and part of 5K2.12 (personal financial difficulties and economic pressures upon a trade or business). See U.S.S.G. Ch. 1, Pt. A, intro. p.s. 4(b) (Nov. 1997).

9. For example, the Guidelines discourage departure based on the defendant's educational and vocational skills, see U.S.S.G. S 5H1.2 (Nov. 1997), and encourage departure based on victim provocation. See U.S.S.G. S 5K2.10 (Nov. 1997).

19

Guideline's heartland." Id. at 95–96 (internal citation and quotation marks omitted); see also United States v. Abuhouran, 161 F.3d 206, 210–211 (3d Cir. 1998), cert. denied, 119 S.Ct. 1479 (1999) (restating the third step of the Koon analysis). Koon adds that departures based on unmentioned factors will be "highly infrequent." 518 U.S. at 96 (quoting U.S.S.G. Ch. 1, Pt. A (Nov. 1995)); see also United States v. Haut, 107 F.3d 213, 218 (3d Cir.), cert. denied, 117 S.Ct. 2528, and cert. denied, 118 S.Ct. 130 (1997).

Before reviewing the district court's application of the Koon analysis, we note the substantial deference that we owe the decision to depart from the Guidelines. See Koon, 518 U.S. at 98; United States v. Sally, 116 F.3d 76, 81 (3d Cir. 1997). While we must also bear in mind that both the Guidelines and Koon indicate that S 5K2.0 departures will be highly infrequent, it was within the district court's discretion to determine whether the facts of this case involved aggravating circumstances of such an exceptional degree that they took the case out of the "heartland" of ordinary fraud cases. See S 5K2.0, comment. (Nov. 1997); Koon, 518 U.S. at 96–98. Koon emphasizes the institutional advantage that district courts have over appellate courts in determining whether the facts of a given case take it out of the "heartland" of Guidelines cases, noting that "[w]hether a given factor is present to a degree not adequately considered by the Commission . . . [is a] matter[ ] determined in large part by comparison with the facts of other Guidelines cases" and that the district courts "see many more Guidelines cases than appellate courts do." Id. at 98; cf. Sally, 116 F.3d at 81 (stating that departure determinations should be left to sentencing courts to make "on a case-by-case basis, relying on the particular facts and circumstances of each case.").

The district court found that several aggravating factors relating to Iannone's criminal conduct, taken collectively, constituted sufficient grounds for an upward departure (which, as noted, the court permissibly achieved by the device of a two-level offense level increase) underS 5K2.0. The court identified the following factors: (1) Iannone's masquerade as a decorated Vietnam combat veteran, a

20

person in the witness protection program, and a government agent on a secret mission; (2) Iannone's misrepresentation that he had received several combat medals as well as a recommendation for the Congressional Medal of Honor; (3) Iannone's attempt to conceal his fraud by faking his own death; (4) Iannone's fabricated story about his family's having been killed by a drunk driver; and (5) the severe psychological harm Iannone's fraud caused his victims. Finding that these factors were not adequately considered by the Guidelines and that they "take[ ] this case outside of the heartland of the [fraud] guideline[ ]," the court departed upwards by two levels. The court noted that it found none of these factors justified departure by itself; but, in combination, the factors made the case very unusual.

The Guidelines neither forbid nor discourage departures based on the factors enumerated by the district court.10 Nor are the factors encouraged bases for departure under the Guidelines.11 Thus, the factors should be classified as "unmentioned" by the Guidelines.12  As unmentioned

_____

10. The forbidden bases for departure are listed supra in note 8. The discouraged bases for departure are a defendant's: (1) age; (2) education and vocational skills; (3) mental and emotional conditions; (4) physical condition or appearance; (5) employment record; (6) family ties and responsibilities, and community ties; (7) military, civic, charitable, or public service, employment-related contributions, and similar prior good works; and (8) subjection to coercion or duress. See SS 5H1.1-5H1.6, 5H1.11, and 5K2.12.

11. Encouraged bases for departure are listed in Chapter Five, Part K of the Guidelines Manual. See, e.g., S 5K2.2 (significant physical injury).

12. One of the factors the district court relied upon as a basis for its S 5K2.0 "combination" departure was the psychological harm Iannone's fraud caused his victims. Notably, "extreme psychological injury" is an encouraged basis for departure under S 5K2.3. However, based on the district court's factual findings, we classify this factor as "unmentioned"
by the Guidelines, rather than as an encouraged basis for departure. While the court found that Iannone's victims suffered more psychological harm than a typical fraud victim ("I would [not] equate the kind of harm that was caused here with the typical kind of harm. . . . [T]he emotional and psychiatric trauma that is attendant not only to losing your money but [also] . . . what you thought was a friendship[ ] . . . [is] a severe

21

factors, a court must "consider[ ] the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, [and] decide whether [the factors are] sufficient to take the case out of the Guideline's heartland," before departing pursuant to S 5K2.0. Koon, 518 U.S. at 95–96 (internal citation and quotation marks omitted); see also United States v. Nolan-Cooper, 155 F.3d 221, 244 (3d Cir. 1998) (restating the Koon analysis of unmentioned factors).

Considering the "structure and theory" of the fraud guideline and the Guidelines as a whole, as Koon instructs, we find that the district court acted within its discretion in concluding that this combination of five unmentioned factors was sufficient to take Iannone's case out of the Guidelines' heartland. 518 U.S. at 96. The Commentary to the fraud guideline expressly provides for upward departures based on factors not listed in the guideline text. In order to remedy the fraud guideline's predominant focus on the monetary amount of the victims' loss, the Commentary states that upward departures may be warranted "[i]n cases in which the loss . . . does not fully capture the harmfulness and seriousness of the conduct." U.S.S.G. S 2F1.1, comment. (n.10) (Nov. 1997). By departing upwards, the district court demonstrated its belief that the harmfulness and seriousness of Iannone's conduct was not adequately captured by the offense level increases for the amounts of the victims' losses. In fact, the court believed that no existing guideline enhancement adequately captured the conduct upon which it based the S 5K2.0 departure. We do not disagree with the district court's conclusion.

Furthermore, while no existing guideline enhancement covers Iannone's conduct, two areas of the Guidelines provide specific bases for upward departures based on conduct similar to his. Subsection (b)(3)(A) of the fraud

_____

harm"), the court also specifically found that there was not sufficient evidence to support an upward departure under S 5K2.3. Thus, because the district court did not depart based on "extreme psychological harm," but rather, based on a combination of circumstances which included a lesser psychological harm component, we classify the factor as "unmentioned" by the Guidelines.

22

guideline provides for a two-level increase in offense level where the offense involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency." U.S.S.G. S 2F1.1(b)(3)(A) (Nov. 1997). The applicable Commentary indicates that the rationale for this enhancement is that "defendants who exploit victims' charitable impulses or trust in government create particular social harm." U.S.S.G. S 2F1.1, comment. (backg'd P 4). Although the S 2F1.1(b)(3)(A) enhancement does not apply to Iannone's conduct, its rationale does: Iannone's misrepresentations that he was a Vietnam veteran, combat medal recipient, government agent, and widower who had lost his family to a drunk driver, created a particular social harm that the Guidelines do not explicitly take into account.[13] Iannone's misrepresentations about being a Vietnam veteran and recipient of several medals exploited his victims' trust in and respect for Vietnam war heroes. Iannone's claim to have been recommended for the Congressional Medal of Honor was particularly exploitive, as this is the nation's highest and most revered military award.[14] His misrepresentation that he worked for a government agency also encouraged his victims' trust. Finally, his misrepresentation that his family had been killed by a drunk driver exploited his victims' charitable impulses. Another area of the Guidelines that provides for an upward departure based on conduct similar to Iannone's is S 5K2.3. It specifically encourages courts to depart upwards if the defendant's conduct caused his victim extreme psychological injury. While the district court did not find that Iannone's victims had suffered extreme psychological injury, it did find that they had suffered a psychological injury more severe than that occurring in a

_____

13. Though Iannone falsely claimed to be a government agent, this conduct did not qualify for a S 2F1.1(b)(3)(A) enhancement because he never claimed to be selling HNR or WDH investment opportunities on behalf of a government agency.

14. Of the more than two million military personnel who served in Vietnam during the period 1964-1973, only 239 have been awarded the Congressional Medal of Honor. See The World Almanac and Book of Facts 1998 158 (Robert Famighetti et al. eds., 1997).

23

typical fraud case and included this as a reason for a departure. These two analogies to conduct similar to Iannone's further support the district court's finding that a S 5K2.0 departure was appropriate.

These analogies also demonstrate that the extent of the district court's departure -- two offense levels-- was reasonable. A district court in determining the extent of a departure should generally do so by analogizing to existing Guidelines provisions. See United States v. Kikumura, 918 F.2d 1084, 1110-14 (3d Cir. 1990) (establishing this Court's standard for determining the proper extent of departure); Baird, 109 F.3d at 872 (applying Kikumura). See also United States v. Adelman, 168 F.3d 84, 87 (2d Cir. 1999) (analogizing to another Guidelines provision was an appropriate method for determining the extent of an upward departure). We review this determination deferentially. See Baird, 109 F.3d at 872. In this case, the district court did not expressly undertake the analogic reasoning that this court generally requires in determining the extent of an upward departure. However, by couching the departure as a two-level increase in the offense level, the district court implicitly did so. As noted above, there is a reasonable analogy in the Guidelines that justifies the extent of the court's departure: subsection (b)(3)(A) of the fraud guideline, which provides for a two-level increase in offense level. See S 2F1.1(b)(3)(A) (Nov. 1997).

We briefly address Iannone's arguments in support of his challenge to the district court's S 5K2.0 departure. Iannone argues that the base offense level for fraud adequately took into account all of his relevant misconduct; that is, both his misrepresentations and the psychological damage to his victims. As to his misrepresentations, Iannone argues in his brief that the Guidelines "obviously contemplated fraudulent misrepresentations . . . as integral to the commission of a fraud" and thus they did not warrant an upward departure under S 5K2.0. Iannone claims that his misrepresentations were either incidental to his fraud or mere acts of concealment and therefore were not sufficiently offensive or unique to "suggest a factor `present in a degree which the Commission did not consider'. . . . [or] `substantially in excess of that which is ordinarily

24

involved in the offense of conviction.' " (Quoting United States v. Uca, 867 F.2d 783, 783 (3d Cir. 1988).) He argues that faking his death, falsely claiming to work for a federal "alphabet agency," and falsely stating that his family had been killed by a drunk driver were merely creative concealment stories invented only to avoid detection, and therefore that those misrepresentations do not warrant an upward departure. He also claims that his misrepresentations of himself as a Vietnam veteran and recipient of combat medals were not part of his fraud. Rather, these misrepresentations had begun years before the frauds and were a result of "his own psychological needs[.]" Finally, the brief asserts that these were "garden variety" fraudulent misrepresentations and were already used as the basis for the vulnerable victim departure.

Iannone correctly points out that fraudulent misrepresentations were an inherent part of his offense and therefore, to a certain degree, are included in the base offense level for fraud. However, the district court found that Iannone's misrepresentations went beyond the usual "heartland" and as such were not adequately taken into account by the Guidelines. Iannone falsely stated to his Colorado victims that he had lost his family to a drunk driver, and the court found that this was done in order to exploit his victims' charitable impulses and encourage their investment. Similarly, the court found that the false persona that Iannone created as a decorated Vietnam veteran and government agent was adopted in order to take advantage of his victims. The court found Iannone's repeated misrepresentations that he had received combat medals particularly offensive, noting that misrepresentation of the ownership of a combat medal may violate federal law.15

_____

15. 18 U.S.C. S 704(a) provides that "[w]hoever knowingly wears . . . any decoration or medal authorized by Congress for the armed forces of the United States, or any of the service medals or badges awarded to the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal, or any colorable imitation thereof, except when authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months, or both." Section 704(b) provides additional punishment if the decoration or medal involved in the offense is the Congressional Medal of Honor.

25

The court also cited Iannone's elaborately staged death at the Pittsburgh airport, the grief this conduct caused his family, and its cost to his creditors. In sum, the court found some of Iannone's misrepresentations to have been particularly egregious and calculated, clearly disagreeing with his contention that they were mere acts of concealment or incidental to his fraud. More importantly, the court found that those misrepresentations were aggravating factors not adequately reflected by any existing guideline provision.16 We find that the district court acted within its discretion in reaching this conclusion.

With respect to the psychological damage to his victims, Iannone claims that the district court abused its discretion by including this as a reason for departure, for two reasons: (1) the psychological harm he caused his victims had already been included in the base offense level for fraud; and (2) the record demonstrates that the four victims who testified at the sentencing hearing are mentally and physically healthy. The Guidelines contradict Iannone's claim that the psychological harm he caused his victims already has been included in the base offense level for fraud. The Commentary to the fraud guideline specifically provides that an upward departure may be appropriate where "the offense caused reasonably foreseeable . . . psychological harm or severe emotional trauma."S 2F1.1, comment. (n.10(c)) (Nov. 1997). While Iannone correctly points out that the record demonstrates that the four victims who testified are mentally and physically healthy, the record also supports the district court's conclusion that the psychological damage suffered by them exceeded that of

_____

16. The court noted that it is not double-counting to subject Iannone to the vulnerable victim enhancement due to O'Dowd's vulnerability as a Vietnam veteran and also include Iannone's masquerade as a Vietnam veteran as one of the reasons for the S 5K2.0 departure. We agree with the district court's conclusion. The enhancements are designed to punish different conduct. The vulnerable victim enhancement, as its name indicates, focuses on the nature of the victim. In contrast, a S 5K2.0 upward departure based in part on Iannone's Vietnam veteran masquerade is based on the rationale that the masquerade itself -- regardless of the nature of the victim -- is an"unmentioned" aggravating factor.

26

the typical fraud case. Most of Iannone's victims were Iannone's friends and/or neighbors. The district court found this circumstance not typical of a fraud case, noting the significant difference between being defrauded by someone you do not know and being defrauded by someone you thought was a friend. The court found that the loss of friendship that accompanied Iannone's fraud inflicted severe harm on his victims. The testimony of Iannone's victims at the sentencing hearing supports the district court's finding. Janice Stringert-Streich, for example, testified that she felt an extremely deep sense of loss and betrayal as a result of Iannone's fraud, and that the fraud destroyed her family. As we stated in United States v. Astorri, "[i]f there is any place in sentencing guidelines analysis where a fact-finder is to be given considerable deference, it is here where the district court is called upon to assess the psychological impact upon victims." 923 F.2d 1052, 1058 (3d Cir. 1991).

In sum, we find that the court did not abuse its discretion in concluding that this combination of misrepresentations and psychological harm to the victims was sufficiently unusual to take Iannone's case out of the heartland of the Guidelines and, as a means of departure, to justify a two-level increase in his offense level.

III. CONCLUSION

We conclude that the district court appropriately enhanced Iannone's offense level pursuant to SS 3A1.1, 3B1.3, and 5K2.0 of the Sentencing Guidelines, and affirm the sentencing judgment.

27

BECKER, Chief Judge, concurring:

I join the majority opinion, as I am constrained to agree that Iannone's abuse of trust enhancement is justified given our decisions in United States v. Bennett, 161 F.3d 171 (3d Cir. 1998); United States v. Sokolow, 91 F.3d 396 (3d Cir. 1996); and United States v. Pardo, 25 F.3d 1187 (3d Cir. 1994). I write separately to express my concern that the current drafting of the abuse of a position of trust guideline is flawed insofar as it has engendered convoluted caselaw in which the concept of a "position of trust" has expanded far beyond the general understanding of that term, making an abuse of trust enhancement a virtual concomitant of a fraud conviction. I therefore urge the Commission to rework the guideline so as to confine "abuse of a position of trust," in fraud cases, to situations more closely approximating traditional trust relationships.1 If it then appears that fraud is not being sufficiently punished, the appropriate remedy would be for the Commission to increase the underlying offense levels, rather than to dilute the concept of"position of trust."

I.

Fraud inherently involves some exploitation of trust. See United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) ("In every successful fraud the defendant will have created confidence and trust in the victim . . . ."); United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995) ("[T]here is a component of misplaced trust inherent in the concept of fraud . . . ."); United States v. Hathcoat , 30 F.3d 913, 915 (7th Cir. 1994) ("By its definition, embezzlement requires a finding of a breach of trust."). While it is possible in theory to exclude some frauds from "abuse of trust" as defined in

_____

1. "[F]rom its earliest days, the Commission has urged the federal judiciary to make suggestions for Guideline revision, viewing them as a means of implementing the ongoing monitoring process." United States v. Rudolph, 137 F.3d 173, 181 (3d Cir. 1998) (Becker, J., concurring); see also U.S.S.G. ch. 1 pt. A, at 4(b) (stating that the Commission will analyze judicial decisions to determine how to refine the Guidelines); United States v. Woods, 24 F.3d 514, 518 n.4 (3d Cir. 1994) (discussing same).

28

Guideline 3B1.3, it seems that our jurisprudence does not do so in practice with any degree of consistency. The contention that "the sentencing enhancement is not intended to apply in every case of fraud," Koehn, 74 F.3d at 201, is easier to promise than to enforce.

In Pardo, we identified three elements to consider in determining whether a position constitutes a position of trust:

> (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

Pardo, 25 F.3d at 1192. Pardo stated that "[T]hese factors should be considered in light of the guiding rationale of the section--to punish `insiders' who abuse their positions rather than those who take advantage of an available opportunity." Id. The difficulty is that the literal application of the three-part test in fraud cases undermines Pardo's limitation to "insiders." Where a defendant orchestrates a fraud, particularly a fraud of the kind prosecuted in federal court, he will almost always be a sufficient "insider" under the Pardo test, even if he is at the same time taking advantage of the opportunity that his acts made available.

A fraudulent scheme ordinarily contains all three Pardo elements: difficulty of detection, authority, and reliance. First, people who commit fraud do not do it overtly; they conceal it. Efforts to make the fraud look legitimate are a necessary part of fraud. Even in a simple scam--e.g., a door-to-door solicitation for a fictitious charity--it is difficult to verify a claim of charitable purpose. Fraud is therefore by its nature difficult to detect. Second, even the average fraud vests a high degree of authority in a defendant vis-a-vis the object of his wrongful act. Fraud consists of getting a victim to give to a criminal authority over items of value, however fleeting or illegitimate. See, e.g., United States v. Sokolow, 91 F.3d 396, 413 (3d Cir. 1996) (defendant had the requisite degree of authority because he was authorized to withdraw victims' funds from

29

his company). And finally, it is difficult to imagine a fraud in which a victim does not rely on the integrity of the defendant; again, that is the very point of fraud. See Agathos v. Starlite Motel, 60 F.3d 143, 147 (3d Cir. 1995) (explaining that the elements of fraud are knowing misrepresentation, intent to induce reliance, and reliance); cf. United States v. Pelkey, 29 F.3d 11, 16 (1st Cir. 1994) (discussing the abuse of trust enhancement and noting that "[s]ome degree of consequential trust and reliance by the victim is to be expected in the majority of fraud cases involving false pretenses").

Because fraud normally includes all three factors, our description of abuse of trust works equally well as a description of fraud: "[I]f one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first." United States v. Lieberman, 971 F.2d 989, 993 (3d Cir. 1992) (quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir. 1990)). In United States v. Bennett, 161 F.3d 171 (3d Cir. 1998), the defendant ran a Ponzi scheme in the guise of a charity, defrauding many victims out of substantial sums. We found that:

> Bennett's authority allowed him to disseminate falsehoods about trust agreements and anonymous benefactors, misrepresent that he received no compensation for his charitable efforts, create a phony board of directors made up of prominent individuals, deceive investors that funds deposited with New Era organizations were held in escrow or quasi-escrow accounts, and provide false information to the I.R.S. and investors.
>
> In all of these undertakings, it was Bennett's position of trust that cloaked him with the requisite authority to deceive. . . .
>
> Furthermore, it is clear the victims relied on Bennett's integrity when making donations. They believed, based on his representations, that their money would be held in low-risk accounts to be matched by anonymous donors and ultimately used for charitable purposes.

30

Id. at 195-96. As soon as the abuse of trust has been described, so has the fraud.

Likewise, describing fraud, or its "cousin," theft by deceit, describes an abuse of trust because fraud is the culpable exploitation of trust:

> By viewing as especially culpable persons who "abuse" their positions of trust, the guideline also recognizes the time-honored legal concept that theft by deceit is to be dealt with more harshly than simple theft. Whereas ordinary theft is by and large an impersonal act, theft by deceit, like its cousin fraud, is entirely personal. Where an individual makes himself particularly vulnerable by entrusting another with substantial authority and discretion to act on his behalf and then relies upon and defers to that person, a decision to take advantage of that trust and vulnerability is particularly abhorrent, as it undermines faith in one's fellow man in a way that the ordinary pick-pocket simply cannot.

United States v. Ragland, 72 F.3d 500, 503 (6th Cir. 1996).

II.

The preceding discussion demonstrates that our tripartite test is better at detecting abuses of trust--including frauds --than it is in defining a true "position" of trust. Thus, garden-variety fraud as well as exotic schemes will ordinarily qualify for the enhancement, even though the Sentencing Guidelines were not supposed to work this way.

True, an occasional exceptional case may not qualify for the enhancement. Pardo is one of the increasingly rare cases to reject an abuse of trust enhancement for fraud. In that case, we found the enhancement unjustified where formal checks against bank fraud were in place, but the defendant's friend, a bank manager, bypassed them (without apparent criminal intent) to help her friend. We found that there was no position of trust because the safeguards were designed so that the bank would not need to rely on borrowers' credibility; the crime should not have been difficult to detect.

31

Judge Harris's opinion distinguishes Iannone's situation from that in Pardo because the difficult-to-detect element does not require due diligence by the victim:

> Iannone's victims did not have to be experts in the oil and gas industry or conduct an extensive investigation into Iannone's business for the S 3B1.3 enhancement to be applicable. In fact, one rationale for a S 3B1.3 enhancement is that, where the defendant occupies a position of trust, his victims are less likely to discover his fraud because they will not investigate the matter as thoroughly as they would in an arm's-length transaction. The focus of the first Pardo prong is on the defendant, not his victims, and requires the court to determine whether the position the defendant occupied allowed him to commit a difficult-to-detect crime.

Slip Op. at 16.

While I agree that Pardo is distinguishable, I disagree that we can "focus" on the defendant to the exclusion of victims. In Pardo, for example, if there had been no formal safeguards against bank fraud, and the bank had relied on managers' assessments of clients' trustworthiness, then the defendant's fraud would have been difficult to detect. Cf. United States v. Sherman, 160 F.3d 967, 969-70 (3d Cir. 1998) (insurance fraud by a doctor abused a position of trust because the victim-insurer used an honor system). But a decision to ignore the victims' level of care does not obviate the need to look at the victims to see whether, under the circumstances, the defendant occupied a position of trust with respect to them.

Pardo is almost unique because the defendant used informal, personal ties to subvert standard, formalized safeguards. In this case, by contrast, Iannone chose a method whereby fraud was inherently difficult to detect-- his own representations about ownership of land, oil leases, and the oil and gas industry. The more informal the encounter between the defendant and his victims, the more difficult it will be for victims to detect potential fraud; the informality of the defendant's "position" leads to the application of the enhancement even though it is far from a traditional trust relationship. This result follows from our

32

decisions, which have yoked the existence of a position of trust to the difficulty of detection under the circumstances of the crime:

> [O]ne has been placed in a position of trust when, by virtue of the authority conferred by the employer and the lack of controls imposed on that authority, he is able to commit an offense that is not readily discoverable. In such cases, the employer, by choice or necessity, is relying primarily on the integrity of the employee to safeguard against the loss occasioned by the offense.

United States v. Craddock, 993 F.2d 338, 342 (3d Cir. 1993) (emphasis added). The exception carved out by Pardo is hardly an exception at all; the game is not worth the candle.

I believe that this difficulty has arisen because our jurisprudence has extracted elements that characterize traditional trust relationships and generalized from them to define "positions of trust." While this case provides an example of a relationship that has the requisite elements and still seems to me to go far beyond the usual meaning of "position of trust," there are also examples of positions of trust without the three distilled elements. In United States v. Claymore, 978 F.2d 421 (8th Cir. 1992), a police officer raped a 13-year-old girl and fathered her child. This crime may have been difficult to prevent, given the authority delegated to police officers, but it was not difficult to detect --particularly insofar as we look at the position of trust from the victim's perspective, see, e.g., United States v. Castagnet, 936 F.2d 57, 62 (2d Cir. 1991). Nevertheless, I have no doubt that the abuse of trust enhancement was justified in Claymore. See also United States v. Zamarripa, 905 F.2d 337, 340 (10th Cir. 1990) (abuse of trust enhancement applicable where babysitter sexually abused child).

Claymore is an example in which the Pardo test would be underinclusive, though the greater danger is that our test so closely parallels the elements of fraud that it is overinclusive. Both the under- and overinclusiveness follow from the fact that the elements of the Pardo test are all

33

basically about deceit, which is involved in most (but not all) abuses of a fiduciary position of trust and is also involved in many other crimes. Deceit occurs in many forms, in relationships both formal and informal, casual and longstanding. Ultimately, then, the use of the tripartite test dilutes the concept of a "position" of trust, reducing our inquiry in practical terms to whether there was an "abuse of trust."

III.

Once we have expanded "abuse of trust" to cover situations in which there is only a misrepresentation of legitimacy that cannot be easily verified, I cannot see a limiting principle. As far as I can discern, the only type of fraud that might not justify the abuse of trust enhancement is a simple "pigeon drop" scam--and that only if we choose to impose some minimal requirement that victims take sensible precautions against fraud.2 Yet federal fraud cases rarely, if ever, involve defendants who commit basic frauds like the pigeon drop. Indeed, the single federal pigeon drop prosecution in the past fifteen years I have found in the reported federal cases involved a feigned position of trust-- a phony "investment adviser"--not unlike Iannone's in this case. See United States v. Jones, 648 F. Supp. 225 (S.D.N.Y. 1986), aff'd in part and rev'd in part sub nom. United States v. Blackmon, 839 F.2d 900 (2d Cir. 1988).3

I therefore believe that the Sentencing Commission should rethink the relationship between the abuse of trust enhancement and fraud crimes.4 In such cases, the

_____

2. A "pigeon drop" is a scheme in which the criminals convince a victim that they have, together, stumbled upon lost riches. They "agree" to split the windfall amongst themselves, but the criminals convince the victim that unspecified legal or tax consequences prevent a simple split. The perpetrators inveigle the victim into giving up her own money to show her good faith and then disappear.

3. The only other federal "pigeon drop" cases I have uncovered predate the Guidelines by an even longer period. See United States v. Ostertag, 619 F.2d 767 (8th Cir. 1980); Charron v. United States, 412 F.2d 657 (9th Cir. 1969); United States v. Edwards, 394 F. Supp. 1288 (E.D. Mo. 1974), aff'd, 516 F.2d 913 (8th Cir. 1975).

4. Although my discussion suggests that this court has "run too far with the ball" in this area, we are not alone. See, e.g., United States v. Becraft,

enhancement should either be limited to fiduciary or quasi-fiduciary relationships, or the Commission should recognize that, as expanded by the cases, abuse of trust is part of the definition of fraud and therefore should not be applied to fraud crimes. See U.S.S.G. S 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.").

Alternatively, I would urge my colleagues to revisit the standard for applying the enhancement to fraud cases. The Court of Appeals for the Second Circuit has an instructive approach that we might consider. Its standard bars the enhancement in fraud cases where the defendant is neither a trusted employee of the victim nor in any fiduciary or quasi-fiduciary relationship with the victim:

> Section 3B1.1 precludes an enhancement where the abuse of trust is included in the specific offense characteristic. Where fraud occurs in arm's-length transactions not involving fiduciary-like relationships, the "trust" that is "abused" is simply the reliance of the victim on the misleading statements or conduct of the defendant. The trust in short is a specific offense characteristic of fraud, and a Section 3B1.3 enhancement is inappropriate. In the instant matter, the lenders' trust in Jolly was simply their reliance on his representations about Microtech's ongoing business and the appearance created by the repayments. Such reliance is the hope of every defendant who engages in fraud.
>
> . . . .
>
> . . . Jolly held himself out as the president of a company seeking capital, not as an investment advisor.

United States v. Jolly, 102 F.3d 46, 49-50 (2d Cir. 1996).

_____

117 F.3d 1450 (D.C. Cir. 1997) (finding an abuse of a position of trust where the defendant, an office manager, was given"carte blanche" by the negligence of her immediate supervisor, permitting her to perpetrate an otherwise blatant fraud). The problem lies in the drafting of the Guidelines and Application Notes.

Under this approach, Iannone's fraud would have been an arm's-length investment transaction, despite his personal relationship with the victims. Friendship should not convert a non-fiduciary relationship into afiduciary one. See Koehn, 74 F.3d at 201 (distinguishing "arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity" from "relationships in which the victim's trust is based on defendant's position in the transaction"); United States v. Mullens, 65 F.3d 1560, 1567 (11th Cir. 1995) (rejecting the enhancement where the defendant befriended his victims and touted himself as a gifted investor, but did not hold himself out as an investment broker; holding that "[f]raudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor").

If the average fraud demands a higher sentence because of the harm inflicted upon the social fabric of trust, then the base offense level of fraud should be increased, rather than forcing courts in each case to identify the ways in which each fraud was slightly easier to commit or more difficult to detect than the average fraud. See United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995) (explaining that the enhancement was designed to punish defendants who are "more culpable" than others in similar positions who engage in criminal acts). The abuse of trust enhancement as applied to fraud bears some resemblance to the children of Garrison Keillor's Lake Wobegon, all of whom are above average. This has unnecessarily complicated the law, stretching the conventional meaning of a position of trust to its breaking point. And it has created a regime that may well be under- as well as over-inclusive by substituting a showing that the defendant deceived victims for a requirement of a true fiduciary or quasi-fiduciary "position of trust." Thus the better approach is for the Sentencing Commission to revisit the area, and bring the notion of abuse of a position of trust back to (or at least close to) its generally understood meaning.

36

A True Copy:
Teste:

            Clerk of the United States Court of Appeals
            for the Third Circuit

37