GREENAWAY, JR., Circuit Judge.
*127 When Congress created the Federal Sentencing Guidelines system, its purpose was to increase uniformity by establishing consistency between the actual conduct defendants committed and the sentences courts imposed. Although the Guidelines are now advisory, the goal remains the same: to channel sentencing discretion in order to produce consistent, disciplined decisions and avoid excessive sentencing disparities. The realization of this purpose requires principled application of the Guidelines. The system works only if courts interpret the Guidelines in a manner faithful to the text the Sentencing Commission has promulgated.
In this case, we are charged with examining whether our interpretation of a particular Sentencing Guideline has comported with the Guideline's text and advanced the system's purpose. Under Guideline § 3B1.3, courts are to impose a two-level enhancement "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." The commentary to § 3B1.3 in turn defines "position of public or private trust" as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. After Kenneth Douglas was convicted of conspiracy to distribute cocaine and conspiracy to engage in money laundering, the District Court in this case imposed the § 3B1.3 enhancement, reasoning that Douglas had abused the special access granted to him by virtue of his position as an airline mechanic at the San Francisco International Airport. We, however, conclude that Douglas is not subject to the enhancement. In so doing, we clarify our approach to cases involving § 3B1.3 and reiterate that the Guideline requires courts to first determine whether a defendant's position was characterized by "professional or managerial discretion" before asking whether he abused the position to facilitate his crime. Because Douglas's position as an airline mechanic did not involve the requisite "professional or managerial discretion," the enhancement does not apply in his case. We will remand to the District Court for resentencing.
I. BACKGROUND
Sometime in 2008, Douglas approached his friend, Tywan Staples, and asked him if he had a way for Douglas to make some extra money. Douglas and Staples had first met in 1991, when they both worked at the Oakland International Airport Maintenance Base. By 2008, both men were working aircraft maintenance for United Airlines at the San Francisco International Airport. Staples worked at the airport's maintenance base, and Douglas served as a mechanic at the terminal.
Staples knew of a potential way for Douglas to earn additional money. For *128 years, Staples and his cousin, Robert Russell Spence, had been operating a drug distribution scheme that transported cocaine from the Bay Area to Pittsburgh. At first, Staples used the U.S. Postal Service and common carriers to ship cocaine to Spence in Pittsburgh, and Spence shipped the proceeds from the subsequent drug sales back to California. But after law enforcement intercepted two packages in 2007, the conspiracy began to transport the drugs and money using couriers on commercial airline flights in and out of Oakland International Airport.
This new system soon ran into trouble as well. In February 2008, a shipment of nineteen kilograms of cocaine was lost during a layover in Las Vegas. The following month, police seized from couriers two packages containing a total of $235,360.
With these recent setbacks fresh in his mind, Staples thought it might be wise to begin using the San Francisco airport as the base of operations. So he asked Douglas if he was able to get bags through the San Francisco airport without being searched. Douglas responded that he was. Douglas in fact had an Airport Operation Authority ("AOA") badge, which allowed him to access the terminal without going through a Transportation Security Administration ("TSA") checkpoint. To enter the terminal, Douglas swiped his badge through a card reader and placed his palm and fingers on a biometric hand pad. After the reader approved his badge and all five fingers matched up with his identity from the badge, the door to the terminal would unlock. On a random basis, the TSA would search employees entering the terminal through these secured employee entrances, but generally, Douglas was able to enter the terminal without being screened.
Staples did not have similar access to the terminal at the San Francisco airport, so he knew Douglas would be a significant addition to the conspiracy. Staples offered to pay Douglas to smuggle cocaine into the terminal. Douglas agreed to do so.
Staples and Douglas subsequently developed a straightforward arrangement. Typically, Staples would deliver between ten and thirteen kilograms of cocaine to Douglas's house in a sports bag filled with clothing. Douglas would subsequently take the bag to the airport and enter through the secured employee entrance to the terminal. Inside the terminal, Douglas would sit down next to the courier and place the bag on the ground between them. Douglas would then leave, and the courier would take the bag and continue onto an eastbound flight. Staples later testified that Douglas smuggled cocaine into the terminal this way roughly forty to fifty times. On some of those occasions, Douglas also served as the courier, taking the drugs to Pittsburgh himself. Each time Douglas got the cocaine into the airport, he was paid $5,000. He earned an additional $5,000 when he flew with the drugs to Pittsburgh.
Relying on airline records, the Government eventually identified forty-six flights departing from the San Francisco airport that were involved with the drug scheme. Douglas was a passenger on seventeen of those flights, sometimes using employee benefit tickets. In several instances, Douglas returned to San Francisco between twelve and twenty-four hours after his original departure flight, spending mere hours at the other destination. The timing of Douglas's flights also coincided with the timing of telephone calls with Staples and deposits into Douglas's bank account.
A grand jury ultimately returned an indictment against Douglas and twenty-one co-defendants. Douglas was charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and conspiracy to engage in money *129 laundering, in violation of 18 U.S.C. § 1956(h). After a bench trial, Douglas was convicted on both counts.
Prior to sentencing, the Probation Office submitted a pre-sentence investigation report ("PSR") that recommended Douglas be held responsible for 450 kilograms of cocaine, resulting in a base offense level of 38. The PSR then called for three two-level enhancements for (1) money laundering in violation of 18 U.S.C. § 1956, pursuant to U.S.S.G. § 2S1.1(b)(2)(B) ; (2) abuse of a position of public or private trust, pursuant to U.S.S.G. § 3B1.3 ; and (3) obstruction of justice, pursuant to U.S.S.G. § 3C1.1. The PSR explained that the enhancement for abuse of a position of trust applied because Douglas had taken advantage of his security clearance and employment as an airline mechanic to smuggle drugs into the airport.
Douglas objected to the calculation of the amount of drugs and the enhancements for abuse of a position of public or private trust and obstruction of justice. The District Court, however, overruled those objections at sentencing. It concluded that Douglas used his "position of trust with the airlines" and his security clearance to aid him in his role in the conspiracy. App. 411. The District Court concluded that Douglas' total offense level was 43, which is the maximum under the Guidelines and corresponds to a sentence of life imprisonment. The District Court ultimately decided to vary downward from the Guidelines recommendation and imposed a sentence of 240 months.
On appeal, a Panel of this Court affirmed Douglas's sentence with respect to the drug quantity calculation and the enhancement for abuse of a position of public or private trust, but it reversed the obstruction of justice enhancement. The full Court subsequently granted Douglas's petition for rehearing en banc solely on the issue of whether he was subject to the enhancement for abuse of a position of trust.[1]
II. JURISDICTION & STANDARD OF REVIEW
The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Whether a defendant occupied a position of public or private trust for purposes of U.S.S.G. § 3B1.3 is a legal question over which we exercise plenary review. United States v. DeMuro , 677 F.3d 550, 567 (3d Cir. 2012). If we determine the defendant held such a position, we review for clear error whether he abused the position. Id.
III. DISCUSSION
In relevant part, U.S.S.G. § 3B1.3 states: "If the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." Application Note 1 to the Guideline adds that a "position of public or private trust" is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. Note 1 also *130 provides three examples of when the two-level enhancement would apply: "the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, [and] the criminal sexual abuse of a patient by a physician under the guise of an examination." Id. The Note further states that the enhancement would "not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." Id.
Application Note 2 to the Guideline likewise reinforces the requirement of discretionary judgment by identifying two exceptions when the enhancement would apply even in the absence of such judgment: cases in which a postal worker "engages in the theft or destruction of undelivered United States mail," and cases in which a defendant abuses "the authority of his or her position in order to obtain, transfer, or issue unlawfully, or without authority, any means of identification," as when a hospital orderly misappropriates information from a patient's chart. Id. cmt. n.2.
A. The Shortcomings of Our Approach to Cases Involving the § 3B1.3 Enhancement
In determining whether a defendant is subject to the § 3B1.3 enhancement for abuse of a position of public or private trust, our precedent calls for a two-part inquiry. First, we must determine whether the defendant actually occupied a position of public or private trust. E.g. , United States v. Iannone , 184 F.3d 214, 222 (3d Cir. 1999). Second, if we conclude that the defendant did hold such a position, then we "must determine whether the defendant abused this position in a manner that significantly facilitated his crime." Id. Separately, we have held that, when determining at step one whether the defendant occupied a position of public or private trust, courts are to "consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." United States v. Pardo , 25 F.3d 1187, 1192 (3d Cir. 1994).
For the last two decades, we have followed this approach in a number of cases, most of which have involved instances where the defendant had been convicted of some kind of fraud. See, e.g. , United States v. Kennedy , 554 F.3d 415, 425 (3d Cir. 2009) ; United States v. Thomas , 315 F.3d 190, 204-05 (3d Cir. 2002), abrogated on other grounds by Loughrin v. United States , --- U.S. ----, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014) ; United States v. Sokolow , 91 F.3d 396, 412-13 (3d Cir. 1996).
Our application of this framework has not been entirely uncontroversial, however. In 1999, in his concurrence in Iannone , then-Chief Judge Becker discussed two related problems with our focus on the three factors we identified in Pardo . First, according to him, the Pardo factors were "better at detecting abuses of trust ... than defining a true 'position' of trust." Iannone , 184 F.3d at 233 (Becker, C.J., concurring). In other words, Chief Judge Becker wrote, "the use of the [ Pardo ] tripartite test dilutes the concept of a 'position' of trust, reducing our inquiry in practical terms to whether there was an 'abuse of trust.' " Id. at 234. And second, because fraud inherently involves an abuse of trust, the emphasis on the Pardo factors meant that the § 3B1.3 enhancement would apply in virtually every fraud case. Id. As Chief Judge Becker explained, "[b]ecause fraud normally includes all three factors, our description of abuse of trust works equally well as a description of fraud." Id. at 232.
To date, this Court has not acted on Chief Judge Becker's concerns. But upon *131 examination, we find merit in the issues he recognized, and we also see additional problems with the Pardo factors' place in our analysis. As a result, we are convinced that our approach to cases involving the § 3B1.3 enhancement now requires refinement.
We come to this conclusion for three reasons.
First , our use of the Pardo factors has conflated the two distinct parts of the § 3B1.3 inquiry. We have made clear that courts must first determine whether the defendant held a position of trust before examining whether he abused that position in a manner that facilitated the commission or concealment of his crime. See, e.g. , Iannone , 184 F.3d at 222. The first question directs the court's attention to the defendant's status, and the second focuses on the defendant's conduct.
Yet the Pardo factors, while purportedly aimed at resolving the first question, instead speak to the second. They demonstrate how the defendant's position enabled his conduct. The first factor-the freedom to commit a difficult-to-detect wrong-is relevant to whether the defendant was able to "commi[t] or conceal[ ] ... the offense," U.S.S.G. § 3B1.3, but it says little about whether he occupied a position of public or private trust in the first place. The second factor leads to the same problem: by asking whether the defendant had authority vis-à-vis the object of the wrongful act, we inevitably end up looking at the nature of the crime committed, rather than first examining the defendant's position. The third factor-whether there has been any reliance on the defendant's integrity-is relevant to the extent it shows that the defendant was unsupervised or given considerable deference. However, factor three leads courts astray when it shifts the focus to the victim's susceptibility or the actions of some third party, because that evidence may have nothing to do with the defendant's position.
Thus, the Pardo factors, taken together, "dilute[ ] the concept of a 'position' of trust, reducing our inquiry in practical terms to whether there was an 'abuse of trust.' " Iannone , 184 F.3d at 234 (Becker, C.J., concurring). Section 3B1.3 does not apply to all abuses of trust, however. The clear text of the Guideline states that only defendants who held a position of trust are subject to the enhancement.
The second reason our approach requires refinement is that our use of the Pardo factors is rooted in an outdated version of the commentary to § 3B1.3. Amended Guidelines commentary is binding on federal courts and supersedes prior judicial interpretations of the Guidelines. See Stinson v. United States , 508 U.S. 36, 46, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ; United States v. Keller , 666 F.3d 103, 108 (3d Cir. 2011). Relevant here is a 1993 amendment to § 3B1.3, Application Note 1, which added the language referring to "professional or managerial discretion" and "considerable deference," as well as the three examples of positions subject to the enhancement. Prior to the amendment, the Note stated, in its entirety, only that "The position of trust must have contributed in some substantial way to facilitating the crime and not merely provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller." U.S.S.G. § 3B1.3 note (Historical Notes, 1993 Amendments).
In Pardo , the Court acknowledged the amendment, but it applied the pre-1993 version of the Note because the conduct at issue had taken place prior to the amendment. 25 F.3d at 1190. And the Court developed the three Pardo factors based *132 on a "[c]ulling" of pre-1993 case law. Id. at 1192. As a result, Pardo does not direct courts to the indicia provided in the amended Application Note 1. The ability to commit a difficult-to-detect wrong-which Pardo deemed "the primary trait that distinguishes a person in a position of trust from one who is not," 25 F.3d at 1191 (quoting United States v. Lieberman , 971 F.2d 989, 993 (3d Cir. 1992) )-says nothing about whether the defendant exercised discretion by virtue of his position, much less professional or managerial discretion. Nor does it speak to whether the defendant's status engendered considerable deference. The significance of the 1993 amendment to Note 1 has led other circuits to conclude that pre-1993 case law is now of little use in determining whether a defendant held a position of trust. See, e.g. , United States v. Reccko , 151 F.3d 29, 33 (1st Cir. 1998) ("It is true that in dealing with the position-of-trust enhancement courts occasionally have emphasized the employee's freedom to commit wrongs that defy facile detection.... But these decisions deal with earlier versions of § 3B1.3 and, thus, antedate the Sentencing Commission's emphasis on managerial or professional discretion." (citation omitted)); United States v. Jankowski , 194 F.3d 878, 884 n.5 (8th Cir. 1999) ("[M]uch of the pre-1993 caselaw on section 3B1.3 is not particularly helpful to us."). By using the Pardo factors to guide our determination of whether the defendant occupied a position of trust, we have failed to give proper effect to the current version of the commentary and its emphasis on professional or managerial discretion.
Finally, the third reason our approach requires refinement is that, in practice, our use of the Pardo factors has placed few limits on the scope of the § 3B1.3 enhancement. Because of Pardo 's emphasis on the ability to commit a difficult-to-detect wrong and authority vis-à-vis the object of the wrong, mere physical access becomes sufficient. It is therefore difficult to imagine a government employee who would not be subject to the enhancement. The enhancement would seemingly apply, for example, to a custodian at a government office building who stole something off of the desk of another government employee. The custodian would likely have keys to every room in the building-i.e., the authority vis-à-vis the object of the crime-and that access would enable him to bypass security measures and commit a difficult-to-detect wrong. For similar reasons, "ordinary bank teller[s]" would likely qualify for the enhancement under Pardo too, if they were not already specifically exempted by Application Note 1. It is evident, however, that the Sentencing Commission did not intend for the enhancement to apply this broadly. Our approach to cases involving § 3B1.3 must distinguish between those positions that are characterized by professional or managerial discretion and those that are not.
B. A Refined, Discretion-Focused Approach
Resolving these issues does not require a wholesale abandonment of our approach to cases involving the § 3B1.3 enhancement. We see no reason to alter the basic structure of our two-part inquiry, because the text of § 3B1.3 requires both that the defendant hold a "position of public or private trust" and that he "abuse[ ]" it "in a manner that significantly facilitated the commission or concealment of the offense."[2]
*133 A change is required, however, to the way we use the three Pardo factors. Accordingly, we will no longer look to those factors when answering the preliminary, status-focused question of whether a defendant held a position of public or private trust. Instead, when determining if the defendant occupied a position of trust, we will ask whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted.[3] In answering this question, we will not consider the context of the crime committed, because, as explained above, the text of the Guideline requires that we first determine whether the defendant held a position that qualifies for the enhancement. The defendant's crime is not relevant to the status-focused inquiry.[4]
In addition to being consistent with the text of the Guideline, this conception of a position of trust also comports with the text of Application Note 1 and its instruction that positions of trust are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1.
The conception aligns, as well, with the specific examples listed in Application Note 1. The Note states that the enhancement would apply to "an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3 cmt. n.1. The first two examples fall into the category of individuals with the power to make decisions free from supervision based on a fiduciary or quasi-fiduciary relationship, while the physician holds an authoritative status such that his or her actions or judgment would be presumptively accepted. Application Note 1 further states that the enhancement would not apply "in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." Id. Neither of those positions fall within the scope of the definition we now adopt.[5]
*134 Only if we find that a defendant occupied a position of trust will we proceed to the second part of the inquiry and ask whether the position significantly facilitated the commission or concealment of the crime. The Pardo factors-although not relevant to the position question-are relevant here, because they speak to how the defendant's position enabled his conduct. Thus, in making this determination, courts should consider, among other things, whether the defendant's position allowed him to commit a difficult-to-detect wrong, and the defendant's authority vis-à-vis the object of the wrongful act. Courts may also consider whether the victim relied on the defendant's integrity, such that the victim became a more susceptible target for the defendant.[6] Courts need not find all of the Pardo factors satisfied before concluding that the enhancement applies. At the same time, however, courts should not impose the enhancement if the defendant's status provided merely some assistance. The text of the Guideline makes clear that the defendant must abuse his position in a manner that significantly facilitated the commission or concealment of the offense.[7]
C. Douglas's Case
Turning to the facts of Douglas's case, we conclude that he did not occupy a position of public or private trust for purposes of § 3B1.3. Absent from the record is any evidence that Douglas's job as an airline mechanic for United Airlines falls within either of the categories of positions of trust we have identified. With regard to the first category, we have no reason to believe that Douglas had the power to make decisions substantially free from supervision based on a fiduciary or fiduciary-like obligation to the airline, airport, or public. Douglas was not required to place any third party's interests above his own, nor did he imply that he would do so. Douglas may have had certain privileges within the airport, but if he possessed any decisionmaking authority whatsoever, it is not apparent that it extended to someone or something other than himself. And even if Douglas did possess the requisite decisionmaking authority, the record simply does not show that he exercised it free from supervision.
Similarly, Douglas's position as a mechanic does not qualify as an authoritative *135 status that would lead his actions or judgment to be presumptively accepted. The record does not establish that Douglas's job required him to exercise any judgment, much less judgment that others accepted. Indeed, Douglas's position was not the product of particularly unique abilities or experience that would cause others to defer to him, as they ordinarily would a doctor or a police officer. As best we can tell, Douglas was an ordinary line mechanic. Without some evidence that his position was characterized by professional or managerial discretion, we are unable to conclude that the § 3B1.3 enhancement applies.[8]
The Government argues that Douglas is subject to the enhancement because he had been granted a security clearance and an AOA badge, allowing him to move freely through the airport. This may demonstrate that the airline and the TSA trusted Douglas, but it does not show that he held a position of trust, as defined by the Guideline. The mere fact that someone trusted the defendant does not satisfy the Guideline's definition. Rather, as we have explained, § 3B1.3 requires professional or managerial discretion. Other courts have therefore termed "position of public or private trust," as used in § 3B1.3, "a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." United States v.Morris , 286 F.3d 1291, 1299 (11th Cir. 2002) (quoting United States v. Garrison , 133 F.3d 831, 839 n.18 (11th Cir. 1998) ); see also United States v. Ragland , 72 F.3d 500, 502-03 (6th Cir. 1996).
In this case, Douglas "may have occupied a position of trust in the colloquial sense that [he] was trusted not to use [his] access for nefarious purposes," but physical access, on its own, does not amount to professional or managerial discretion. United States v. Tann , 532 F.3d 868, 876 (D.C. Cir. 2008).[9] On the contrary, Application Note 2 makes clear that § 3B1.3 applies in only two situations where the defendant did not exercise such discretion and was trusted solely with physical access: theft of mail by postal workers and identity theft. Notably, the Sentencing Commission has not expanded this exception to the general rule beyond those two categories, despite amending the commentary several times since 1993, including most recently in 2009, and despite the heightened security at airports over that *136 timeframe and the corresponding trust inherent in granting physical access to airport employees.[10] Thus, in the absence of further action from the Commission, the Government must show that Douglas possessed more than just the right to be somewhere.
The Government also contends that we can infer Douglas enjoyed a degree of authority and autonomy from the fact he was able to smuggle cocaine into the airport over forty times without being caught. This logic, however, "turns the guideline on its head: it does not follow that, merely because a defendant's position enables him to commit an offense, the position must have been unsupervised and, thus, a position of trust." United States v. Parrilla Román , 485 F.3d 185, 191 (1st Cir. 2007). The Government also bears the burden of establishing that the enhancement applies. United States v. Napolitan , 762 F.3d 297, 309 (3d Cir. 2014). That burden is not met when the Government simply reiterates evidence of the defendant's ability to commit the underlying crime. Here, the Government has shown only that Douglas's access to the airport terminal helped him commit the offense. It has not demonstrated that Douglas's position at the airport was characterized by professional or managerial discretion.[11] Accordingly, there is no need to proceed to the second part of the inquiry and determine whether Douglas abused his position in a manner that significantly facilitated the commission or concealment of his crime. We hold that he did not occupy a position of public or private trust for purposes of U.S.S.G. § 3B1.3.
IV. CONCLUSION
For the foregoing reasons, we will reverse the District Court's imposition of the two-level enhancement under U.S.S.G. § 3B1.3, and remand for resentencing.

The order granting rehearing en banc vacated the original panel opinion in its entirety, but the full Court did not rehear the drug quantity calculation or obstruction of justice enhancement issues. The Panel has issued a new opinion that reinstates the original Panel opinion except for the issue addressed here. That new Panel opinion is filed contemporaneously with this en banc opinion. See United States v. Douglas , 849 F.3d 40 (3d Cir. 2017).

Other circuits have also adopted similar two-part inquiries. See, e.g. , United States v. Reccko , 151 F.3d 29, 31 (1st Cir. 1998) ; United States v. Ollison , 555 F.3d 152, 165-66 (5th Cir. 2009) ; United States v. DeMarco , 784 F.3d 388, 397 (7th Cir. 2015) ; United States v. Aubrey , 800 F.3d 1115, 1134 (9th Cir. 2015) ; United States v. Merriman , 647 F.3d 1002, 1005 (10th Cir. 2011) ; United States v. Walker , 490 F.3d 1282, 1300 (11th Cir. 2007).

Judge Shwartz's dissenting opinion expresses concern over the § 3B1.3 enhancement being limited to situations where a fiduciary relationship existed. It therefore bears emphasis that our definition of a position of trust is disjunctive, and a fiduciary relationship is not required for the enhancement to apply. Nor does our definition encompass only defendants holding professional or managerial titles. Although the defendant's job title may be relevant to the inquiry, it is not dispositive.

Our conception of a position of trust is similar, though not identical, to that articulated by other circuits. See, e.g. , United States v. Tiojanco , 286 F.3d 1019, 1021 (7th Cir. 2002) (Positions of trust "involve the type of complex, situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by, or monitored against, established protocol."); United States v. Young , 266 F.3d 468, 475 (6th Cir. 2001) ("A position of trust is marked by substantial managerial discretion and fiduciary-like responsibilities-a position with supervisory authority and one which engenders considerable deference."). Other circuits have also more broadly emphasized the concepts of discretion, deference, and authority. See, e.g. , Aubrey , 800 F.3d at 1134 ; Reccko , 151 F.3d at 34.

Notwithstanding the problems with our past use of Pardo , the approach we now adopt is also largely reconcilable with our post-1993 precedent. Several of those cases involve applying the enhancement to fraud committed by a defendant abusing a fiduciary or quasi-fiduciary relationship. See, e.g. , Kennedy , 554 F.3d at 417-18, 425 ; Thomas , 315 F.3d at 193-94, 205 ; United States v. Hart , 273 F.3d 363, 377-79 (3d Cir. 2001) ; Iannone , 184 F.3d at 217-19, 225 ; United States v. Bennett , 161 F.3d 171, 174-75, 194-96 (3d Cir. 1998) ; Sokolow , 91 F.3d at 400-01, 413. In three other cases, we found subject to the enhancement defendants in particular positions of authority whose judgment would be presumptively accepted. See United States v. Babaria , 775 F.3d 593, 595-98 (3d Cir. 2014) (physician); United States v. Dullum , 560 F.3d 133, 135-37, 140-41 & n.5 (3d Cir. 2009) (Secret Service agent who also served in senior leadership position at his church); United States v. Sherman , 160 F.3d 967, 969-70 (3d Cir. 1998) (physician).

Other factors may be relevant as well; we need not provide an exhaustive list.

Contrary to the assertions of Judge Shwartz's dissenting opinion, we do not hold that courts should disregard "the context in which the defendant's actions took place" when deciding whether to apply the § 3B1.3 enhancement. Dissenting Op. (Shwartz, J.) at 138. This second part of the inquiry in fact requires courts to consider the context in which the defendant's actions took place.
At the same time, our holding that the defendant's crime is irrelevant to the initial status-focused inquiry does not mean that the enhancement is limited to situations where the defendant was "task[ed] ... with preventing the type of wrong that he committed." Dissenting Op. (Shwartz, J.) at 143 n.7. No such nexus is required for the defendant to have abused his position in a manner that significantly facilitated the commission or concealment of the offense.

This conclusion is consistent with that reached by the First Circuit, which has twice held that airport employees able to bypass security measures do not, by that fact alone, hold positions of trust for purposes of § 3B1.3. See United States v. Correy , 570 F.3d 373, 395 (1st Cir. 2009) (airport janitor who helped smuggle drugs); United States v. Parrilla Román , 485 F.3d 185, 190-92 (1st Cir. 2007) (airport baggage handlers who helped smuggle drugs).

In arguing that Douglas's unique physical access to the airport should be sufficient to subject him to the § 3B1.3 enhancement, Judge Shwartz's dissenting opinion relies heavily on three cases in which other circuits "applied the ... enhancement to prison workers who abuse[d] positions that gave them special access to highly secure and regulated locations." Dissenting Op. (Shwartz, J.) at 142 (citing United States v. Gilliam , 315 F.3d 614, 618 (6th Cir. 2003) ; United States v. Brown , 7 F.3d 1155, 1162 (5th Cir. 1993) ; and United States v. Armstrong , 992 F.2d 171, 172-73 (8th Cir. 1993) ). Two of the cases cited, however, involved conduct predating the 1993 amendment to Application Note 1 and therefore contained no discussion of professional or managerial discretion. See Brown , 7 F.3d at 1161 ; Armstrong , 992 F.2d at 173-74. The third case involved a defendant who did not actually work in a prison, but instead was an alcohol and drug counselor to individuals on federal probation supervision. See Gilliam , 315 F.3d at 616. The application of the enhancement there could not have turned on any special, physical access granted to the defendant, because he in fact possessed no such access.

The heightened risks associated with physical access to airports and other public facilities are addressed in part by § 5K2.14 of the Guidelines, which provides for an upward departure where "national security, public health, or safety" has been "significantly endangered" by a defendant's conduct. U.S.S.G. § 5K2.14.

We recognize that we have refined our approach to cases involving § 3B1.3 in this opinion and that the Government did not have the benefit of knowing that approach when it sought the enhancement before the District Court and on appeal. Nonetheless, the Government has had ample opportunity to develop the record fully in this case, and it has not produced any evidence showing Douglas's position was characterized by professional or managerial discretion. Under such circumstances, we have no reservations in concluding that the Government has not met its burden of establishing that the enhancement applies.