**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-2355 & 22-2621
_____

UNITED STATES OF AMERICA

v.

PATRICK BARKERS-WOODE,
     Appellant in No. 22-2355

UNITED STATES OF AMERICA

v.

NANA MENSAH,
     Appellant in No. 22-2621
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Nos. 1:17-cr-00357-005 & 1:17-cr-00357-002)
District Judges: Honorable Jennifer P. Wilson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on January 31, 2025

Before: KRAUSE, PORTER, and ROTH, *Circuit Judges*.

(Filed: May 7, 2025)

_____

OPINION OF THE COURT

_____

Julie A. McGrain
Federal Public Defender District of New Jersey
Office of Federal Public Defender
800-840 Cooper Street
Suite 350
Camden, NJ 08102

    *Counsel for Appellant Patrick Barkers-Woode*

Ray Kim
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

    *Counsel for Appellant Nana Mensah*

Scott R. Ford
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102

    *Counsel for Appellee*

**PORTER**, *Circuit Judge*.

A jury convicted Patrick Barkers-Woode and Nana Mensah of mail fraud, aggravated identity theft, conspiracy to commit mail fraud, and conspiracy to commit aggravated identity theft. Both Barkers-Woode and Mensah raise several challenges related to their sentencings. Barkers-Woode additionally challenges the District Court's decision to admit certain evidence during his trial. For the reasons below, we will reverse and remand in part and affirm in part.

I

At the time of the conspiracy, Sprint Corporation ran a sales promotion that offered a smartphone to new cellular service customers at no upfront cost. Sprint planned to recoup the upfront costs of the promotion throughout the life of the cellular service contract. Customers with good credit could sign up over the phone or the internet without ever entering a Sprint store. Sprint then mailed the promotional smartphone to the customer's address that he provided at sign up and forwarded shipment tracking information.

The conspiracy's fraud was straightforward. Conspiracy members in Ghana used the internet to obtain the necessary personal information—name, date of birth, social security number, etc.—of unrelated and unknowing individuals. Using that information, the conspirators signed these individuals up as new Sprint customers and arranged for the promotional smartphones to be sent to vacant homes. Barkers-Woode, Mensah, and others tracked, retrieved, and delivered the smartphones to a buyer. At some point, Mensah began placing fraudulent orders himself. All told, the conspiracy was responsible for 274 orders of 833 smartphones

totaling $357,565.92 in actual loss and $595,399.76 in intended loss.[1] The government identified 248 individuals whose identities had been misused in the fraud.

Barkers-Woode and Mensah were tried and found guilty by a jury on November 22, 2019. On July 13, 2022, Barkers-Woode received a within-guidelines sentence of 111 months' imprisonment with two years of supervised release. And on August 30, 2022, Mensah received a below-guidelines sentence of 99 months' imprisonment with three years of supervised release. Barkers-Woode and Mensah's separate appeals followed and were consolidated for our resolution.

## II

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction over its final judgment under 28 U.S.C. § 1291.

## III

Barkers-Woode and Mensah present several issues on appeal. *First*, both Barkers-Woode and Mensah argue that the District Court erred by applying a 14-point enhancement under U.S.S.G. § 2B1.1(b)(1)(H) based on a calculated intended loss of $595,399.76 in light of this Court's decision in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). *Second*, both Barkers-Woode and Mensah argue that the District Court erred by applying a 2-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) based on the number of victims. *Third* and *fourth*, Barkers-Woode separately argues that the District

---

[1] Sprint was able to cancel several shipments of smartphones after learning about the fraud.

Court erred by admitting evidence in violation of Federal Rule of Evidence 404(b)(1) and that the District Court violated his Sixth Amendment right to counsel by requiring him to proceed pro se without sufficiently apprising him of the risks of doing so per *Faretta v. California*, 422 U.S. 806 (1975). *Fifth*, Mensah separately argues that the District Court erred by applying sentencing enhancements dependent on facts not charged in his indictment and not proved beyond a reasonable doubt to a jury. We address each in turn.

A

We review non-preserved challenges to the District Court's legal interpretation of the Sentencing Guidelines for plain error even if a change in law retrospectively exposes the error during the direct appellate review process. *Henderson v. United States*, 568 U.S. 266, 273–74 (2013). Under plain error review, we can only grant relief if "(1) the District Court committed an 'error,' (2) it was 'plain,' and (3) it affected the 'substantial rights' of the defendant." *United States v. Plotts*, 359 F.3d 247, 249 (3d Cir. 2004) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). As the government concedes, the District Court's calculation of "loss" based on "intended loss" for the purposes of an offense characteristic enhancement under U.S.S.G. § 2B1.1(b)(1) was plain error in light of our decision in *Banks*.

Barkers-Woode's and Mensah's Presentence Investigation Reports calculated that the conspiracy was responsible for an actual loss of $357,565.92 and an intended loss of $595.399.76. At their respective sentencings, the District Court applied a 14-point enhancement based on an intended loss greater than $550,000. USSG § 2B1.1(b)(1)(H). That was correct under then-applicable case law but not in light

5

of *Banks*, where we held that "loss" within the meaning of § 2B1.1(b)(1) means actual loss, not intended loss. 55 F.4th at 257. Application of § 2B1.1(b)(1) based on intended loss was plain error that affected Barkers-Woode's and Mensah's substantial rights, so we will remand for resentencing on this issue.[2]

B

We exercise plenary review over properly preserved challenges to the District Court's legal interpretation of the Sentencing Guidelines. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). Under that standard, the District Court did not err by defining "victim" under U.S.S.G. § 2B1.1(b)(2) to include individuals whose identities are stolen because victims of identity theft are encompassed within the plain meaning of "victim." *See, e.g.*, *Victim*, Black's Law Dictionary (12th ed. 2024) (defining "victim" as "a person harmed by a crime, tort, or other wrong."). Recognizing that victims of identity theft are "victims" for the purposes of U.S.S.G. § 2B1.1(b)(2) does not break new ground. In *United States v. Kennedy*, this Court previously recognized that victims of identity theft are part of the "commonsense or dictionary definition" of "victim." 554 F.3d 415, 419 (3d Cir. 2009), *abrogated on other grounds by United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018) (en banc).

_____

[2] Because the District Court already calculated actual loss for Barkers-Woode, Barkers-Woode's Appendix ("B-W's App.") at 791, and Mensah, Mensah's Appendix at 694, all that remains for the District Court on remand is to recalculate the Guidelines range using the actual loss amount and to resentence accordingly.

6

Despite this, our holding in *Kennedy* stated that "victim" within the meaning of the Guidelines excludes those who do not suffer pecuniary harm and that rule plainly applies to individuals whose identities were stolen but cannot demonstrate any resultant pecuniary harm. *Id.* But *Kennedy* was decided under a regime of deference to the Guidelines' commentary that we have since overruled, and it interpreted a version of the Guidelines that have since been materially amended, so *Kennedy*'s pecuniary-harm requirement no longer controls.

In *Kennedy* we adopted an interpretation of the word victim that was "hard to reconcile with commonsense notions of what it means to be a victim" because "our task . . . [wa]s to adhere to the Guidelines and its Applications Notes" *Id.* at 422. In *United States v. Nasir*, this Court rejected that understanding of our role. 17 F.4th 459, 470–71 (3d Cir. 2021) (en banc). Instead, we now "exhaust all the traditional tools of construction" before deciding that a Guideline provision is "genuinely ambiguous." *Id.* at 471 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)). And even then, "there are limits to deference." *Id.* Indeed, it is hard to see how we could reach any other result today than that "victim" in § 2B1.1 means what it is generally understood to mean. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012) (explaining that the idea that "[w]ords are to be understood in the ordinary, everyday meanings—unless the context indicates that they bear a technical sense . . . is the most fundamental semantic rule of interpretation.").

Even assuming that our deference regime had not changed, the fact that the Guidelines have been materially amended would compel us to reach the same result—"victim" in § 2B1.1 includes victims of identity theft. When we decided

*Kennedy*, Application Notes 1 and 2 together defined "victim" as "(A) any person who sustained [the reasonably foreseeable pecuniary harm that resulted from the offense] or (B) any individual who sustained bodily injury as a result of the offense." USSG § 2B1.1, cmt. nn.1–2 (2009). The United States Sentencing Commission quickly and explicitly rebuked *Kennedy* by promulgating Application Note 4(E), which expanded the definition of victim to include "any individual whose means of identification was used unlawfully or without authority." United States Sentencing Commission, Amendment 726 (effective Nov. 1, 2009), https://www.ussc.gov/guidelines/amendment/726.

Barkers-Woode and Mensah argue that deference to the Guidelines' amended definition of the term "victim" is not warranted under *Nasir*. But we need not decide whether deference is appropriate because we independently hold that "victim" is not ambiguous as to whether it includes victims of identity theft.

C

We review a District Court's decision to admit evidence for abuse of discretion, meaning that we will reverse only if its decision was "clearly contrary to reason and not justified by the evidence." *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001) (quoting *United States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996)). Under that deferential standard, the District Court did not err by admitting testimony from a co-conspirator about a similar but non-charged scheme to defraud Walmart since it directly proved a conspiratorial agreement among Barkers-Woode and his other conspirators.

8

Federal Rule of Evidence 404(b)(1) prohibits introducing evidence of "any other crime, wrong, or act" to demonstrate character and action in conformity with that character. Fed. R. Evid. 404(b)(1). The threshold question of every 404(b) objection is whether the proffered bad act qualifies as an "other" act that must be analyzed under Rule 404(b) or an "intrinsic" act that is never analyzed under Rule 404(b). *United States v. Green*, 617 F.3d 233, 248–49 (3d Cir. 2010). Under our caselaw, an "intrinsic" act either "directly proves the charged offense" or "facilitate[s] the commission of" and "is performed contemporaneously with the charged crime." *Id* (internal quotations omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). Thus, "the nature and scope of the evidence able to be deemed intrinsic will vary with the charged offense." *United States v. Williams*, 974 F.3d 320, 357 (3d Cir. 2020). "Where a criminal conspiracy is charged, courts have afforded the prosecution considerable leeway to present evidence, even of unalleged acts within the indictment period, that reflects a conspiratorial agreement." *Id.* That makes sense because a conspiratorial agreement directly proves—indeed, it is the defining feature of—every conspiracy. *See, e.g.*, 1 Wharton's Criminal Law § 8:2 (16th ed. 2024) (defining conspiracy as "an agreement between two or more persons to commit an unlawful act or to commit a lawful act by unlawful means.").

At Barkers-Woode's trial, the prosecution introduced testimony over Barkers-Woode's objection of a co-conspirator describing how the conspiracy perpetrated more or less the same fraud against Walmart. According to that testimony, the conspiracy arranged for the same "guys in Africa" to place "fraudulent" orders of electronics for pickup at Walmart. B-W's App. at 399. The fraud against Walmart required in-store

9

pickup and involved different electronics ("TVs and gaming consoles" as opposed to smartphones), but were otherwise identical. *Id*. at 402. The two frauds occurred contemporaneously with each other such that the conspirators would retrieve packages from Sprint and pickups from Walmart in a single trip. Conspirators discussed the two frauds simultaneously in the same text message exchanges. When asked whether the fraud against Walmart was "[p]art of the same scheme," Barkers-Woode's co-conspirator answered, "[b]asically, yes." *Id.* at 399. Asked again moments later, if it was "the same scheme," the co-conspirator again answered, "[e]ssentially, yes." *Id.* at 402.

Barkers-Woode maintains that testimony of the fraud against Walmart is not intrinsic since "the charged conspiracy was a conspiracy to defraud *Sprint*." Barkers-Woode's Opening Br. at 22. But evidence of a practically identical and contemporaneous conspiracy among the same set of individuals to defraud Walmart was probative of a conspiratorial agreement among that same set of individuals to defraud Sprint. Therefore, the testimony of the fraud against Walmart "directly proves" a conspiratorial agreement among the conspirators to defraud Sprint. *Green*, 617 F.3d at 248.

D

We review a District Court's determination of a defendant's forfeiture of his Sixth Amendment right to counsel *de novo*. *United States v. Goldberg*, 67 F.3d 1092, 1097 (3d Cir. 1995). Barkers-Woode argues that the District Court erred by not conducting a colloquy that sufficiently apprised him of the risks inherent in pro se representation pursuant to *Faretta*. We disagree and hold that Barkers-Woode forfeited his Sixth

10

Amendment right through protracted and extreme dilatory conduct despite the District Court's several warnings.

In *Goldberg* we recognized two "circumstances in which the dilatory tactics of a defendant can amount to a forfeiture of his right to counsel." 67 F.3d at 1094. The first is "a true forfeiture" which "require[s] extremely dilatory conduct" and "can result regardless of whether the defendant has been warned about engaging in misconduct, and regardless of whether the defendant has been advised of the risks of proceeding *pro se*, as required by *Faretta*." *Id*. at 1101. The other is "waiver by conduct," although we have explained that this situation is better understood as a type of forfeiture. *Id*. Waiver by conduct is triggered by "conduct less severe than sufficient to warrant a forfeiture" and still "requires that a defendant be warned about the consequences of his conduct, including the risks of proceeding *pro se*." *Id.* at 1101.

While the District Court did not specify under which doctrine it was requiring Barkers-Woode to proceed *pro se*, we are satisfied that Barkers-Woode's conduct was so dilatory as to meet the heightened requirements of forfeiture. Throughout his trial and in the immediate aftermath, Barkers-Woode was represented by John Yaninek, already his third attorney. relationship broke down after Barkers-Woode filed spurious complaints about Yaninek to the Pennsylvania Disciplinary Board and "became combative" when Yaninek visited Barkers-Woode at Perry County Prison on March 5, 2020. Dist. Ct. Dkt. No. 291 at 1–2. According to Yaninek, Barkers-Woode "became combative holding on to documents" that Yaninek believed were "subject to the Court's Protective Order (Doc. 245) because they contain victim personal identification information." *Id*. at 2. Barkers-Woode had to be "physically

removed from the prison's conference room by correctional officers." *Id.*

That issue of access to protected documents fatally impaired Barkers-Woode's relationships with each of his subsequent attorneys. At a status conference convened to discuss his fifth attorney's request to withdraw, that attorney explained how things had "deteriorated even further" since the last time they were "before the court for this type of conference." B-W's App. at 641. He noted that "conversations between me and Mr. Barkers-Woode [have] become very hostile to the point where phones get hung up" and stated that he was not "ethically able to continue this representation of Mr. Barkers-Woode." *Id.* When Barkers-Woode was given the opportunity to respond, he demanded information about his attorney's superior, expressed his intention to file a complaint, and recriminated other accusations (which his attorney denied). Recognizing an "adversarial" relationship and "a complete breakdown in any kind of effective communication," the District Court granted his fifth attorney's motion to withdraw. *Id.* at 645–46.

Before appointing a sixth attorney, the District Court unmistakably warned Barkers-Woode that if these issues continued to delay proceedings, then he would have to represent himself.

> If you continue to be unable to work with appointed counsel but you don't wish to proceed self-represented, then if we find ourselves at this juncture again with your sixth attorney, I will have no choice but to make that decision for you because, and I need you to understand, your Sixth Amendment right to counsel is not absolute, and the court can put

12

limitations on it, such as refusing to appoint a seventh attorney and requiring you to proceed self-represented.

*Id.* at 647–48. The District Court repeated that it was "willing to appoint one more attorney for you," id. at 647, that "this will be the last change of counsel in this matter," *id*., and that "there will be a sixth attorney if you want to proceed with counsel, but there will not be a seventh," *id.* at 648.

Yet only three months later, the District Court found itself confronting the same issue at another status conference after Barkers-Woode "file[d] a letter regarding certain disagreements with counsel." *Id*. at 655. The "disagreements" between Barkers-Woode and his sixth counsel happened to be the recurring issue of the District Court's protective order. The District Court asked Barkers-Woode several times whether he was requesting that his sixth attorney (Korey Leslie) be removed from his case and each time Barkers-Woode refused to answer:

Court: . . . [D]o you wish to remove Mr. Leslie as your counsel?

Barkers-Woode: Your Honor this question is too soon because there's other layers that has to be discussed before we can arrive to answering this question.

Court: I'm asking if you're requesting that I remove— you sent a letter.

Barkers-Woode: I would rather he does the right thing first, you know. And then if he still insists of staying this way, then I'll have no choice but to - - because I have requested for a public defender because, Your

13

Honor, for some reason I can't identify - - I can't draw the line between the prosecutor's office and the court-appointed office. I cannot draw the line.

Court: All right. So I'm going to construe your answer as that you are requesting that I remove Mr. Leslie.

Barkers-Woode: That's not what I'm saying.

Court: Well, you need to answer my question, Mr. Barkers-Woode. . . So let me ask this question a different way. Have you and Mr. Leslie worked everything out?

Barkers-Woode: We never had - - we haven't had the opportunity to do that.

*Id.* at 664–65. Afterwards, Barkers-Woode repeated his objections to moving forward with the protective order still in place.

Court: So either your counsel will file a sentencing memorandum and we'll have a sentencing hearing or you'll proceed pro se. That's where we are.

Barkers-Woode: I disagree with that. . . Like you mentioned, Your Honor, it seems like I'm going on in circles, but that's my defense, that's my stand. My stand is that I need my discoveries. I need my discoveries. I need to have my discoveries. I did not have - - I do not want an attorney dictating whether I can have my discoveries or not because that creates conflicts.

. . .

> Court: Mr. Barkers-Woode, I've made my ruling. I've made my position clear. You either proceed with Mr. Leslie through to the sentencing hearing or you proceed pro se.

*Id.* at 669–70.

Barkers-Woode next asked whether the Court had jurisdiction to "move on to sentencing without a decision from appeal"—referring to a frivolous interlocutory appeal of the District Court's protective order that Barkers-Woode filed without his attorney's knowledge. *Id.* at 670. The District Court explained that there is no pending appeal, but Barkers-Woode insisted that "[a] decision has to be made" by the Third Circuit. *Id.* at 671. After more back and forth, the District Court finally discharged Barkers-Woode's sixth attorney, appointed standby counsel, and informed Barkers-Woode that he would be required to proceed pro se. In so doing, the District Court did not err.

Although the District Court's warnings did not "advise him in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful," they did not have to given Barkers-Woode's forfeiture of his right to counsel. *Goldberg*, 67 F.3d at 1099 (quoting *United States v. Welty*, 674 F.2d 185, 188–89 (3d Cir. 1982)). As the District Court correctly observed, the circumstances giving rise to forfeiture "[we]re somewhat extraordinary." B-W's App. at 676. Those circumstances include the following: that Barkers-Woode cycled through six attorneys several of whom he was hostile to and combative with on multiple occasions; that he had to be

15

physically removed from the presence of one attorney; that he filed and threatened to file spurious complaints about their representation; and that he engaged in other conduct intended to delay the proceedings. Taken together, across all his counsels's attempts to represent him, Barkers-Woode engaged in the sort of "extremely dilatory conduct" that results in forfeiture of the Sixth Amendment's right to counsel. *See United States v. Thomas*, 357 F.3d 357, 363 (3d Cir. 2004) (holding that a defendant forfeited his right to counsel when, in relationships with four attorneys, he was verbally abusive, refused to cooperate in producing a witness list, hung up on counsel, attempted to force the filing of frivolous claims, and became involved in a physical confrontation).

E

Finally, the District Court did not err by applying a 4-point enhancement under U.S.S.G. § 2B1.1(b)(10)(B) and a 2-point enhancement under U.S.S.G. § 3B1.1(a), both of which were contingent on facts not charged in Mensah's indictment and not proved beyond a reasonable doubt to a jury at his trial. Mensah argues that "the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), should be extended to the Guidelines and require[] that any fact that increases a person's Guidelines range must be charged in an indictment and proven beyond a reasonable doubt." Mensah's Opening Br. at 14. But we already rejected this extension of *Apprendi* in *United States v. Grier*, where we held that "the right to proof beyond a reasonable doubt does not apply to facts relevant to enhancements under an advisory Guidelines regime." 475 F.3d at 565.

\*     \*     \*

16

For these reasons, as to both Barkers-Woode and Mensah we will reverse the orders of the District Court applying § 2B1.1(b)(1) based on intended loss and remand for it to recalculate the Guidelines range using actual loss and resentence accordingly. We also will affirm the orders of the District Court applying § 2B1.1(b)(2) to both appellants. As to Barkers-Woode, we will affirm the District Court's decisions to admit the testimony of a co-conspirator describing a related fraud against Walmart at his trial and to require Barkers-Woode to proceed pro se after his sixth attorney withdrew. As to Mensah, we will affirm the District Court's order applying § 2B1.1(b)(10)(B) and § 3B1.1(a).